## MERCEDES FOSTER BALDWIN v. R. HENRY BÁLDWIN

9 So. (2nd) 717                                          Division A

September 25, 1942

Morrow & Fulton, for petitioner.

E. M. Baynes, for respondent.

BUFORD, J.:

On petition for certiorari we review order entered on motion to dismiss for want of sufficient allegations dismissing bill of complaint with leave to amend in a suit for divorce.

The bill alleges, inter alia, that the parties are over the age of twenty-one years, are residents of Florida, were married in Atlanta, Georgia, on December 17, 1924; that one daughter who was twelve years of age at date of institution of suit, was born to this union and that the parties lived together as husband and wife until the month of June, 1941.

The bill also avers:

"From the time the said parties were married until the year 1939, they were very happily married. During said period of time the defendant was a model husband and father, apparently devoted to his wife and child, spending practically all of his leisure time in their company in and around the home; that during such period of time, the defendant seemed to have no other interests than his work and his family. He spent considerable time working in his yard with plants and shrubs, and otherwise enhancing the beauty and comfort of his home. However, the defendant, who is a physician and medical doctor, had during the year 1939 employed in his office in the Comeau Building in West Palm Beach, Florida, a nurse and receptionist by the name of Louise Hattaway; that during the latter part of 1939 the defendant made it

very apparent to the plaintiff by his conduct that he had more than a business interest in the said Louise Hattaway. The defendant suddenly lost all interest apparently in his wife and child, and lost all interest in his home. Friends and neighbors of the plaintiff began to tell her that they had seen the defendant and the said Louise Hattaway out together at various places in and around West Palm Beach, Florida, at all hours of the day and night. Plaintiff, however, refused to believe that the defendant had been unfaithful to her, and because of her great love and affection for the defendant, she gave him the benefit of every doubt.

"During the Christmas season of 1939, the plaintiff was given a very rare and beautiful orchid by a friend as a Christmas gift. She was very proud of the plant and displayed it with pride to her friends and guests who came into the house during the Christmas season, all of which the defendant knew, but notwithstanding this the defendant told the plaintiff that the said Louise Hattaway was going to a dance, and that he wanted the plaintiff to let her wear the orchid as a corsage. When the defendant insisted that the plaintiff surrender the orchid she did so reluctantly, stating that the defendant must tell said Louise Hattaway that the orchid was a present from Dr. and Mrs. Baldwin. The plaintiff at that time cautioned the defendant not to make the present as a gift from himself, because she stated that in doing so, he might be misjudged. Plaintiff at that time told the defendant that it was not proper for a doctor to give his nurse a corsage. The plaintiff felt that this cautionary remark, concerning the manner in which the orchid should be presented to the said Louise Hattaway, would warn the defendant that his attitude and con-

duct had put the plaintiff on notice that something was wrong, and hence cause him to mend his ways. However, it did not have the desired result, because in May of 1940, the defendant planned a trip to Atlanta, Georgia, to attend a medical meeting, and stated that he wished to take his vacation trip at the same time. At the last moment he advised the plaintiff that he intended to take the said Louise Hattaway along with the plaintiff and his daughter, and used as a pretense the statement that he wished the said Louise Hattaway to take a course in the operation of some sort of electrical machine that was to be taught at the convention, and promising further that he would dump the said Louise Hattaway on one of his cousins in Atlanta, and that they would not see her during their stay there. However, defendant and the said Louise Hattaway spent practically all of the time that they were in Atlanta, together, and the plaintiff was almost entirely ignored. The unquestioned interest of the defendant in the said Louise Hattaway and his flagrant unfaithfulness to the plaintiff crushed the plaintiff's heart and caused her intense pain and suffering, both in mind and body.

"The growing interest in the said Louise Hattaway by the defendant, and his growing indifference to the plaintiff and her child became so apparent that the plaintiff talked to the defendant about it and begged him on bended knee to give up this girl and to return his affections to his wife and his child. She constantly implored the defendant to discharge the said nurse from his office, and to discontinue seeing her. This he refused to do, stating that he intended to see her as often as he pleased. And later during the month of September, A. D. 1940, invited the said Louise Hatta-

way and her mother, Mrs. Hattaway, to accompany the defendant and the plaintiff to the movies on a Sunday evening. It had never been the policy of the plaintiff and the defendant to attend theaters on Sunday, which fact plaintiff called to the attention of the defendant, but he insisted and demanded that the plaintiff accompany them to the theatre, which she did reluctantly, and very much upset, nervously and otherwise.

"Plaintiff continued to implore the defendant to discharge the said Louise Hattaway and he finally agreed to do so after the winter season of 1940. On the evening of February 3, 1941, which was the birthday of the plaintiff, and on which occasion she was entertaining some of her friends for the evening, the defendant made a public statement stating that there had been domestic unpleasantness in his family for some time, but that he was soon making a change in his office and that everything then would be all right. However, months passed and there was no change in the attitude of the defendant towards his wife and child and in his conduct of them, but rather he continued to keep constant company with his office girl and instead of firing her, as he agreed to do, he increased her salary, and in addition thereto, during the month of July, 1940, he purchased a suit of furniture from the Palm Beach Mercantile Company and gave it to his office girl. And sometime later, made her a present of an automobile, all of which was unknown to the plaintiff, but which she has ascertained since that time.

"During the month of August, 1941, a group of friends had come to the home of the plaintiff and the defendant, and the defendant agreed to accompany

them to the theater. However, at the last moment, he stated that he could not go, that he had some calls to make. His conduct was so suspicious that the plaintiff took the other friends to the picture show, and then she and one of her close friends got in an automobile and drove to the yacht club and parked nearby. In a few moments, the defendant drove up and parked his car and went into the Yacht Club. One hour and fifteen minutes later, he came out of the Yacht Club, got into his car and drove off. The plaintiff and her friend, in another automobile, followed him. North on Olive and then west on Dixie Highway and then north again. Just after passing the Good Samaritan Hospital, the plaintiff and her friend noticed a woman's head rise up out of the back seat and crawl up over into the front seat, and she saw the said Louise Hattaway and recognized her kissing the defendant, her husband. As the defendant and the said Louise Hattaway drove northward in their automobile they embraced eath other constantly and exchanged kisses. The plaintiff and her friend followed the said car as far north on Dixie Highway in West Palm Beach as Forty-first Street and North Poinsettia Avenue. The plaintiff became so crashed in heart and sick in body that it was necessary for her and her friend to turn back. Enroute to their home, they stopped their automobile at a drug-store, where a druggist administered a sedative. Later in the evening at her home, it was necessary for the plaintiff to summon a physician, who came and treated her for nervous shock. When the defendant returned to his home late that evening, he found the physician there administering to his wife, the plaintiff, and asked: 'What is wrong?' He was advised that the plaintiff

came home ill in a condition of shock. He immediately went to his bedroom and slept soundly the rest of the night, leaving the physician and the friend of the plaintiff to sit up with her and to administer to her needs. Later the plaintiff told the defendant of the things she had seen, and demanded that the said Louise Hattaway be fired. Whereupon the defendant advised his wife that he was sending the said Louise Hattaway on a vacation. However, the said Louise Hattaway continued to visit the defendant constantly in his office, and to cap the climax, on Saturday, August 30, 1941, Mrs. Hattaway, the mother of the said Louise Hattaway, phoned the plaintiff and told her that Dr. Baldwin was desperately in love with Louise and that he was going to divorce the plaintiff and marry her daughter. During the month of September, 1941, the defendant advised the plaintiff that he was going to bring the said Louise Hattaway back to work in his office and that it didn't make any difference how the plaintiff felt about it or what she had to say about it. However, friends and relatives of the plaintiff contacted Dr. Baldwin and told him that he has flagrantly courted his office girl to the extent that it was community gossip and that he was not only ruining his reputation as a physician and a man, but that he was disgracing and humiliating his wife and ruining the name of his child, and demanded that he send the said Louise Hattaway away from the City of West Palm Beach and discontinue his illicit relationship with her. Whereupon the said Louise Hattaway was sent to Washington D. C., apparently for a job. Said Louise Hattaway remained in Washington only for a short time, during which time she called the defendant up almost every day, reversing the

telephone charges. Within a few weeks the defendant sent some money to the said Louise Hattaway with which to return to West Palm Beach, which she did.

"Although the defendant has not again engaged the said nurse in his office, he has been seen with her repeatedly in the day time and night time at football games, theaters, at race tracks and at many other places where people congregate. Recently at the Florida Medical Convention in Hollywood, Florida, the defendant and the said Louise Hattaway were together in the Hollywood Beach Hotel in the presence of all of the physicians from Palm Beach County in attendance there. The defendant and the said Louise Hattaway have also recently spent a portion of a night in a hotel in Stuart, Florida, together.

### IV

"That the plaintiff is a sensitive, refined, delicate Christian lady, who has the respect and the admiration of all of her neighbors and friends; she has at all times during her marriage to the defendant, and before, conducted herself in an exemplary fashion; she has been a chaste, dutiful and affectionate wife and mother; during her entire married life she has had no other interests than her family and her home, but notwithstanding all of this, the defendant has wrecked her life, her health and her home, crushed her heart and left her body broken. During the ordeal aforesaid, she has lost over twenty pounds of weight, spent many, many sleepless nights and suffered in mind and body the most intense pain and agony that a human being could be subjected to."

It has been necessary to quote the foregoing allegations for our judgment herein to be of any benefit to the bench and bar.

Plaintiff categorically charged defendant with being guilty of "(1) adultery; (2) extreme cruelty by the defendant to the plaintiff."

What conduct will amount to extreme cruelty by one spouse toward the other must depend upon circumstances of each case. See Williams v. Williams, 23 Fla. 324, 2 Sou. 768, Wetherington v. Wetherington, 57 Fla. 551, 49 Sou. 549.

It is settled in this jurisdiction that cruelty warranting divorce need not be actually bodily harm but may be a course of conduct calculated to torture complaining spouse's mental or emotional nature and affecting her bodily health. See Gratz v. Gratz, 137 Fla. 709, 188 Sou. 580. See also Henderson v. Henderson, 137 Fla. 770, 189 Sou. 724; Roebling v. Roebling, 119 Fla. 768, 161 Sou. 715; Diem v. Diem, 141 Fla. 260, 193 Sou. 65; Gratz v. Gratz, 127 Fla. 605, 173 Sou. 442; Walstrom v. Walstrom, 124 Fla. 366, 168 Sou. 532; Curry v. Curry, 120 Fla. 28, 162 Sou. 52; Nolan v. Nolan, 121 Fla. 130, 163 Sou. 401.

It is also recognized that what constituted extreme cruelty as ground for divorce may be determined by the degree of one's culture, his emotions, nervous reaction or moral sense. See Diem v. Diem, supra; Bergman v. Bergman, 145 Fla. 10, 199 Sou. 920.

Proof of the allegations of fact set forth in the bill of complaint in this case would not be sufficient to warrant a judicial decree finding the defendant guilty of adultery with Miss Hattaway, but the existence of such condition might well be sufficient ground for the plaintiff in this case to reasonably and honestly believe that the relations existing between her husband and this young woman are that of paramour and mistress, and, if his conduct has been such as to convince

the plaintiff that such relationship does exist he cannot escape the result of his having pursued this association with the knowledge that he was thereby inflicting great pain and suffering upon his wife and thereby creating a real hazard to her mental and physical health, if it be shown that existence of the wife's pain and suffering because of such conduct was made known to him, or if he might have reasonably expected such result from his conduct. There is a real reason why it has been recognized as hereinbefore stated, that what will constitute extreme cruelty inflicted on one spouse by the other must depend upon the facts of each case and also "may be determined by the degree of one's culture, his emotions, nervous reaction or moral sense." See Diem v. Diem, and Bergman v. Bergman, supra. That reason is that conduct which might cause one husband or wife great pain or suffering might cause another practically no annoyance. For instance, for a husband to devote much of his time and attention to some other woman or women might not be seriously objectionable to some wives. They might look upon it as a harmless pasttime, retaining confidence in such husband and suffering no pain and anguish by reason thereof. While the same conduct on the part of another husband might make his wife utterly miserable and inflict upon her so much pain and suffering as to endanger both her physical and mental health.

"Cruelty" is defined in Practical Standard Dictionary as follows: "The disposition to inflict pain; also, indifference to the suffering of other beings; inhumanity."

So it is that when a spouse knowingly and continuously indulges in conduct knowing that the same

causes his or her spouse to suffer extreme mental or physical pain and anguish, such' spouse is guilty of cruelty. Some men, or some women, might have no objection to his or her spouse constantly insisting that he or she be governed in all his or her conduct and action by the expressed direction of the spouse, while to another man or woman such constantly attempted direction and supervision by the spouse might be so distasteful and obnoxious as to constitute extreme cruelty and result in the destruction of his or her mental or physical health. It is not so much what the spouse may do as it is what effect that which is so done has upon his or her spouse. It is one of the obligations which both parties assume in undertaking the marital relations to cleave unto each other and to forsake all others.

If the allegations of the bill are true then the husband preferred the association with Miss Hattaway to the happiness of his wife. Or stated otherwise, he preferred to cause his wife extreme pain and suffering rather than to refrain from his association with and attention to Miss Hattaway.

If the allegations of the bill are true the plaintiff happened to be one of those women whose natural disposition and moral sense are such that such conduct on the part of the husband causes her great pain and suffering to such an extent that to continue the marital relation is hazardous to her mental and physical welfare and by persisting in such conduct he has been guilty of extreme cruelty to plaintiff. It is no defense to say she is just too jealous; because if she is so it may be her misfortune, but it is no more her fault than is the color of her eyes, the size of her foot or her susceptibility to fright, and her suffering may be

just as real and painful as any mental pain and suffering can be.

Certainly the alleged conduct of the husband cannot be approved or condoned by those who still entertain the view that a wife may not be expected to look with favor upon the division of her husband's affections with another woman. It, therefore, follows that if the allegations be true he is committing a wrong which results in extreme cruelty to plaintiff.

If the allegations of the bill of complaint are true it was the duty of the husband, when he found that his association with Miss Hattaway was causing his wife great pain and suffering to such an extent as to become a hazard to her mental and/or physical condition, to desist from such association, regardless of how much pleasure he might have found in that association.

There are hundreds of different ways in which a husband or wife may be guilty of extreme cruelty to his or her spouse. In fact, the acts of cruelty found sufficient to warrant divorce in the above cited cases are practically all different one from the other. The question for the alleged offending spouse to determine is not, whether or not the alleged conduct *should* result in the infliction of pain and suffering, but is whether or not in fact such conduct does or reasonably may have that result and effect on the other spouse, and if it does, then such spouse continues in the indulgence in that conduct at his or her peril of destroying and bringing to an end the marital relation.

It is a matter of common knowledge, of which courts must take judicial cognizance, that mental pain and suffering (that thing commonly called "worry") is one of the major afflictions which result in the destruction

of both mental and physical health. It affects every vital organ and probably results in more mental and physical wrecks than any other one affliction.

We must hold that the chancellor committed error in holding the allegations of the bill of complaint insufficient to show extreme cruelty.

It is, therefore, ordered that the writ of certiorari be awarded and the order of the chancellor here under review be quashed and the cause remanded for further proceedings not inconsistent with the views herein expressed.

So ordered.

BROWN, C. J., and WHITFIELD, J., concurs.

ADAMS, J., concurs specially.

ADAMS, J., (concurring specially):

I concur in the foregoing opinion and judgment, and am also of the opinion that the bill is sufficient to charge adultery.