248 S.W.2d 560 (1952)
SIMON
v.
SIMON.
No. 42494.
Supreme Court of Missouri, Division No. 1.
April 14, 1952.
Motion for Rehearing or to Modify Opinion Denied May 12, 1952.
*561 Horace Warren Kimbrell, Kansas City, for appellant.
R. Carter Tucker, John Murphy, William H. Wilson, J. Gordon Siddens, Kansas City, for respondent.
COIL, Commissioner.
This is a divorce case. Plaintiff, wife, and defendant husband, were married in 1945. It was her third and his first marriage. They adopted one child in January 1948 and another in the summer of 1949. At the time of trial in 1951 these children were 3 and 2 years of age. Plaintiff, 38, and defendant, 39, separated in June or July 1950. Plaintiff averred general indignities. The trial court's judgment awarded her a divorce, custody of the children and $200 monthly for their support, $25,000 gross alimony, and $2,000 attorneys' fees. After unavailing after-trial motions, including a motion for new trial, defendant has appealed from the ensuing final judgment.
Plaintiff-respondent's motion to dismiss this appeal was taken with the case. It appears that this cause was first tried in September 1950, resulting in a judgment ordering defendant to pay $200 a month for the support of the minor children and $500 attorneys' fees. The cause was then by order of the trial court returned to "general docket for reassignment." It was then tried anew in a different division of the court resulting in the judgment from which the instant appeal is taken. The ground of plaintiff's motion is this: that because defendant has contributed nothing to the support of his minor children since June *562 1950, he is guilty of "willful and contemptuous disrespect for the orders of the court and, therefore, appellant should be denied the right to be heard on this appeal." This brief statement of the ground of the motion and the record facts demonstrate that the motion is without merit. The motion to dismiss appeal is overruled.
On the merits, defendant contends that: (1) plaintiff failed to prove that she is an "innocent" party, and (2) the trial court was without jurisdiction to grant a divorce because plaintiff attached to her petition a false affidavit; defendant also contends the court erred in awarding alimony in gross, and that the amounts awarded for alimony, support of the children, and attorneys' fees are excessive.
Defendant does not contend that the evidence adduced failed to prove plaintiff an injured party. He contends that plaintiff's evidence affirmatively shows that she was not an innocent party. One seeking a divorce must prove himself to be an injured and innocent party. Cody v. Cody, Mo.App., 233 S.W.2d 777, 781[5]; Chapman v. Chapman, Mo.App., 230 S.W.2d 149, 151[3, 4].
Defendant says that portions of plaintiff's testimony affirmatively demonstrate that she is not an innocent party. We examine these items of testimony in the light of the entire record.
Plaintiff testified that immediately prior to the time when plaintiff says defendant finally left their home, she removed certain papers from his coat pocket.
Plaintiff testified, in explanation of this incident, that defendant had been away from home for a week; that it had theretofore been determined that there was to be a final separation and divorce; that she could see that among the papers was her title to an automobile which defendant had bought for her; that she knew or thought the papers also had to do with the sale of their former home which had also been in her name; that he had refused to tell her what happened to the proceeds of the sale. She said defendant asked if she had removed the papers and she admitted she had; that defendant replied that he was going to show her that second mortgage. Later, plaintiff took the second mortgage on the former home, which proved to be among the papers removed and which she claimed as her sole property, to her lawyer. The mortgage was later sold for $2,200, which money she used for living and fixed expenses from the time of the separation to the time of trial.
Plaintiff testified that she habitually went through the pockets of her husband's clothes during their marriage. She also testified, however, that this was a custom or a habit initiated by defendant's going through her pocketbook; and further that neither plaintiff nor defendant thought anything about the action of the other or considered it of any importance.
Plaintiff testified that she "swung" at her husband on a number of occasions; on one occasion threw a newspaper at him, and on another, a telephone book; that she had frequently called him a "kike." (He is a Jew and she is a gentile.) Plaintiff also testified, however, that she did these acts under provocation, when the husband had begun an argument which had exasperated her or when he was physically abusing her by twisting and bruising her arm.
Plaintiff testified that on one occasion she received flowers at Christmas from a man in St. Louis whom she had known in her professional capacity as a model. She said the flowers were in the nature of a "Christmas card" and that the incident went entirely unnoticed at the time.
All the foregoing incidents might, under some circumstances, constitute indignities by a wife toward her husband. Each, alone or in combination, might affirmatively show that a wife was not an "innocent" party within the meaning of that word as used in connection with one's right to a divorce. But these incidents do not support that conclusion in this case. These papers were removed at a time when there was some justification for plaintiff's resort to this measure at the very moment of final separation, in order to obtain some information regarding finances which theretofore had been refused her. And while the habits of a husband or a wife in habitually searching *563 the pocketbook or pockets of the other, may or may not be conducive to marital happiness, nevertheless when the actions are mutual and unopposed by either party, the searches are not "indignities." Likewise, throwing a newspaper and a telephone book at a husband who provoked the acts by physical violence, and hurling the epithet "kike" at a Jewish husband, if provoked as plaintiff testified it was, are not acts necessarily requiring the conclusion that a wife is not an "innocent" party.
The other items of testimony to which defendant points concern some of plaintiff's statements as to her marital happiness with defendant. It is true that some of the testimony of plaintiff is vague and in some respects inconsistent and contradictory. But defendant would have us isolate portions of her testimony such as plaintiff's assertion that she had never been happy with defendant and that "I think the nearest that I ever loved Albert is when we got our babies, because they meant so much to me"; and that she had always known the marriage wouldn't work and had so told defendant before they were married. Defendant contends that these statements show that plaintiff entered into this marriage knowing it wouldn't succeed; that the inference follows that it was a marriage of convenience and that a woman entering into a marriage in such a state of mind is not entitled to a divorce. However, despite the contradictory nature of some of plaintiff's statements in the record as to her attitude toward the marriage, her reasons for desiring a divorce, and as to the cause of the trouble between plaintiff and defendant, when the entire record is examined, a reasonable view of all of plaintiff's testimony does not attribute to the isolated portions seized upon by defendant the meaning which he ascribes to them. Plaintiff in her testimony professed love for her husband at the time of the marriage, love for him as late as the early spring of 1950, told of her efforts to hold the marriage together and of her attempts to remove her husband from the all-pervading influence of the members of his family who were hostile to her.
The reasonable construction of plaintiff's statements pointed to by defendant, when considered in connection with her entire testimony is that plaintiff had some doubts as to the eventual success of her marriage due to her knowledge of the unfriendly attitude of his family toward her, and to the fact that she, a gentile, was marrying one of the Jewish faith. We cannot say, however, that plaintiff entered into this marriage as a marriage of convenience or with no resolution or desire for its success. Nor can we say that the isolated portions of her testimony pointed to by defendant respecting her marital happiness and her premarital view as to the success of the marriage constituted evidence from which it may be said that plaintiff was not an "innocent" party.
An "innocent" party is not required to conclusively prove freedom from all fault, or such exemplary conduct as excludes any misconduct or all unwise or uncalled-for acts. He or she need show only that, under all the circumstances of a particular case, he or she has not been guilty of conduct constituting a ground or grounds for divorce under RSMo 452.010, V.A.M.S. Cody v. Cody, supra, 233 S.W.2d 782[6, 7]; Politte v. Politte, Mo.App., 230 S.W.2d 142, 148[4]. Plaintiff sustained her burden of proof in the instant case.
Furthermore, defendant withdrew his cross-petition and sought to defeat plaintiff's action so that they might again live together. He professed his continuing and abiding love for plaintiff and expressed his confident judgment that he and plaintiff could even now make a success of their marriage.
Defendant next contends that plaintiff's affidavit to her petition was false and that the court was thereby without jurisdiction to award a divorce. Plaintiff's petition averred in part "that the defendant since said marriage has been continuously involved in law violations and in the toils of legal proceedings, that he has been guilty of commission of offenses against the laws of the states of Missouri and Kansas and the United States." Defendant says that *564 this charge was not only unsupported by evidence but was false and known to be false by plaintiff at the time she executed the affidavit to her petition. This contention is without merit. Plaintiff's petition avers some 17 or 20 alleged indignities. One was the averment above quoted. Plaintiff's evidence did not sustain this charge. But neither did her evidence sustain more than 5 or 6 of her 17 or 20 charges. Failure of proof as to an indignity charged can have no possible effect upon the jurisdiction of the court to try the case or, in the event there is sufficient evidence, upon the jurisdiction of the court to enter a judgment of divorce.
As stated, the evidence did not sustain the quoted averment. We may not conclude from the record that plaintiff did or did not in good faith at the time she made the affidavit to her divorce petition believe this averment to be true. Even if false and known to be false, the court's jurisdiction would be unaffected. What bearing affirmative proof of falseness and knowledge of falseness of such a charge might have upon the action a court might properly take in a given case need not be considered.
We may observe that the averment quoted above constitutes a serious charge against defendant, and unless plaintiff did have good reasons for believing the charge to be true, we do not condone her making it. However, this charge, at least in so far as it affects this divorce action, is in the same category as any other charge of an indignity not sustained by the proof. This particular charge did not deprive the trial court of jurisdiction to grant the divorce upon sufficient proof of other indignities charged.
Defendant cites Hinkle v. Lovelace, 204 Mo. 208, 102 S.W. 1015, 11 L.R.A.,N.S., 730; Higginbotham v. Higginbotham, Mo. App., 146 S.W.2d 856; and Stevens v. Stevens, 170 Mo.App. 322, 156 S.W. 68. These cases hold that the statutory affidavit to a divorce petition is jurisdictional; if the affidavit does not accompany the petition or does not set forth the things required by the statute, it is defective and deprives the court of jurisdiction to grant a divorce. These cases are without applicability to the contention made.
Defendant's contentions as to the propriety of the monetary awards require a detailed review of portions of the evidence.
Defendant testified that: at the time of trial he was unemployed and owned no real or personal property, bonds, stocks or other securities, no equitable interest in any property, no interest in any business, and had no income whatever. He was last employed in 1949, as we understand, as sales manager for the U. S. Packing & Rendering Company, of which he was also secretary and director. He estimated his total income during the years 1942 to 1951, inclusive, as follows: 1942, $2,500; 1943, $12,000; 1944, $10,000; 1945, $6,000; 1946, $9,000; 1947, $9,000; 1948, $5,000; 1949, $3,000; 1950, no income except a $3,000 back pay check from the year 1949; 1951, no income to the time of trial and none anticipated. At a hearing on his motion to modify the decree, defendant said he had obtained more accurate figures, and that his gross earnings for the following years were: 1945, $9,245.32; 1946, $8,045.99; 1947, $9,200; 1948, about $6,000; 1946, $2,979; 1950, no earnings except the receipt of $3,000 as back pay.
Defendant said that the Packing Co. was a family corporation operated by the Simon family in a building owned by another family corporation, the Simon Realty Company; that early in 1949 the Packing Co. became insolvent and ceased operations; that in 1943 he acquired some stock in the Packing Co. worth $3,000 or $4,000; that when he married in 1945 he still had this same stock, then not worth $3,000; that when he married he also had stock in the Realty Co. worth about $5,000; that the Simon family assets were owned equally among father, mother, brothers, and sisters and that his stock in each of the two companies probably equalled 1/10 of its total stock. As stated, defendant said he did not own any stock at the time of trial.
Defendant further testified that he was secretary of the Realty Co.; that that company never maintained a bank account; that in 1950 it sold the building theretofore occupied by the Packing Co. for $250,000; *565 that he knew there was a mortgage on the building for $125,000; he knew nothing of the disposition of the $125,000 as, although he was the company's secretary, he had nothing whatever to do with the transaction and received no money therefrom.
Defendant introduced in evidence, at the hearing on his motion to modify, a "settlement statement" between the Realty Co. and Kenneth K. Simon as sellers and the purchaser of the building. This showed a total sales price of $250,000, but reflected a net balance to Realty Co. of $81,040.84. It also showed that disbursements of $77,592.81 had theretofore been made from the proceeds of sale to Kenneth K. Simon as reimbursement for advances made and in payment of his part of the property conveyed and for his stock in the corporation.
Defendant said he received no part of this $81,000; that some of it was used to pay personal obligations of the corporation's officers which apparently had been guaranteed by the corporation. The trial court indicated that it was not concerned with the obligations of the other company officials. Defendant then made an offer, which was denied, to prove that he was obligated to pay 1/3 of $22,500 for a certain written release. He further offered but was not permitted to prove that he was then a defendant in a case in Kansas in which a plaintiff had sued U. S. Packing Co., a corporation, Sam Simon, Melvin Simon, and himself, wherein was sought recovery of $12,000 on a note.
Defendant further testified at the trial that the Packing Co. began business in Kansas City in 1942; that there was no profit in any year except one (the profit or the year were not shown); that the volume of livestock purchased weekly by the Packing Co. would average $150,000 to $200,000.
Defendant said that he expended between $6,000 and $7,000 each on two houses, one owned by plaintiff and the other by her mother. In 1946 defendant bought a house and placed the title in his wife's name "for business reasons." As we understand, he paid $20,000, $10,000 cash and $10,000 mortgage. He and plaintiff later sold the house for $24,000, $8,000 cash and $16,000 deed of trust. Defendant said he applied the $8,000 cash upon the existing $10,000 mortgage. Apparently, the $16,000 note and the $144 monthly payments thereon were payable to both plaintiff and defendant. For a period of time, these monthly payments were used by plaintiff. Defendant pledged the notes secured by the $16,000 deed of trust for a $15,000 personal loan from a bank. However, he insisted that the $144 payments continued to be made to him and his wife.
The vendee of the house later refinanced his $16,000 obligation, resulting in plaintiff and defendant receiving $10,000 cash and a $3,200 note secured by a second deed of trust. (This is the $3,200 mortgage which plaintiff took from defendant's pocket.) The $10,000 cash was apparently applied as payment on the $15,000 loan which defendant had contracted. This $10,000 draft was payable to defendant and plaintiff, defendant endorsing both their names apparently at the time he delivered it to the bank; plaintiff said without her authority and defendant said with her authority.
In October 1949, a farm was purchased at Gashland, Missouri. Plaintiff claimed she purchased and defendant claimed he purchased and put it in his wife's name. In any event, this farm was purchased for a family home and plaintiff and defendant resided there from December 1949 until the final separation. Defendant testified that he made a $7,500 down payment on the farm and in early 1950 spent $2,500 for livestock, labor and materials.
Defendant testified that in 1947 he bought his wife an automobile costing $2,500 and put the title in her name; that the year before his marriage he bought for her a $2,100 diamond ring and a $450 fur coat; all of which items plaintiff now has.
As to what we term the "financial situation", plaintiff's testimony is extremely difficult to follow. However, a fair summary is about as follows:
She had been a model prior to her marriage and apparently at least part of the time after the marriage. Prior to her marriage she accumulated $4,500 from modeling and operating a beauty shop. As a result of a former divorce, she owned the *566 Paseo house and furniture. She had no other money or assets at the time of the marriage. After they left the Paseo property it produced $150 monthly rental, which either plaintiff herself received or was used by both.
Plaintiff's version as to the farm was that it cost $19,000; that she paid $6,300, $4,000 of her own money and $2,300 of her mother's money (which she says had been turned over to them to keep for her mother). According to plaintiff, the balance due on the farm at the time of trial was $9,000. How the other $3,700 was paid is not shown, although apparently defendant paid $1,100 in April 1950, and plaintiff paid $1,100 in September 1950 out of the proceeds of the sale of the $3,200 deed of trust. Plaintiff testified that she owned the furniture in the farm home.
Plaintiff said that defendant put a $4,000 mortgage on her Paseo house. Defendant could not have done this without plaintiff's active cooperation. Plaintiff testified that $3,000 of this $4,000 was put back in her mother's account or lockbox to replace the $2,300 used in the down payment on the farm. While there was no showing as to the disposition of the other $1,000, it does not appear that this $1,000 was not used for the benefit of the family. Plaintiff once stated that defendant finally got the other $3,000 but made no explanation of her statement which was in the form of a "yes" answer to a leading question. Plaintiff also intimated that defendant had spent some other money belonging to her mother, but again her testimony was too indefinite to constitute a factual basis for any inference to that effect.
Plaintiff testified that defendant bought their lake home and placed it in plaintiff's name because she didn't want to continue living in her Paseo home and because the other Simon boys were buying homes for their wives. There was no testimony concerning this lake property contradictory of defendant's testimony. Plaintiff agreed that it was sold for $24,000, $8,000 cash and a $16,000 first deed of trust. She said she thought they owed some of the $8,000 and that she personally got no part of the $8,000. There was no showing that this $8,000 was not, as defendant said, used to apply on the loan of $10,000 made by defendant when he bought the home. Plaintiff also agreed that monthly checks were received for a period of time as payments on the $16,000 first mortgage and that they would both endorse the checks and the proceeds were apparently used in running the household. Plaintiff did not know what happened to the $16,000 deed of trust, but said that she received no part of the $10,000 cash paid when it was refinanced. However, her testimony does not indicate that the check for this $10,000, even though not endorsed by her (admittedly her name was endorsed thereon by defendant), was not used by defendant to retire or as a payment on his $15,000 loan for which he had pledged the $16,000 first deed of trust. The record does not show what happened to the proceeds of the $15,000 loan, nor does it show that it was not used for the mutual benefit of the parties. As has been indicated, plaintiff obtained the $3,200 second deed of trust and sold it for $2,200. There is no testimony as to how the $3,200 deed of trust was sold for $2,200 or how the notes it secured were negotiated without defendant's endorsement.
Another financial transaction which is left completely dangling concerns an obligation incurred by defendant in 1943 (before his marriage), the security for which were apparently five government bonds of $500 each. Apparently this loan was increased and other bonds were deposited which defendant testified the bank foreclosed. There is a suggestion that this loan was finally paid in June 1950 and that defendant's brother Kenneth received the bonds. Defendant denied any knowledge of this transaction other than that he did owe the bank $6,500 and that the bank took the bonds in satisfaction of the debt.
Plaintiff testified that at one time, she didn't say when, defendant brought home $46,000 in cash which he wanted to bury under the floor of their basement; she objected; he told her not to tell his family anything about this money. The money apparently was not buried in their home and there was no showing whatever as to what happened to it or to whom it belonged.
*567 Plaintiff testified also, as we understand, that defendant's brother used to stay in the Menorah Hospital and apparently the members of the Simon family sometimes met in his hospital room. Twice she saw her husband carry a suitcase full of money out of the hospital. On one occasion, it was brought to their home and divided among the father, a brother of defendant, and defendant. The other time, the suitcase full of money was taken to the home of her sister-in-law and the sister-in-law and defendant and Mr. Simon, the father, took it upstairs to Melvin's room (a brother), but she didn't know what happened to the money. Plaintiff didn't know how much was in the suitcase either time, but in each instance, the suitcase was stuffed full and she saw $500 bills.
Plaintiff also testified in effect that the U. S. Packing Co. had money and was always going broke and just waiting for the war to get going before going back into business.
We have attempted to set forth the substance of all the testimony in this case which could form any basis for the judgment of the court respecting alimony, attorneys' fees, and money for the support of the minor children. The summary is confusing and incomplete because the record is confusing and incomplete. In final analysis, however, the record shows that plaintiff's financial condition at the time of trial was about this: she owned the Paseo house subject perhaps to a $4,000 indebtedness, from which she received $150 monthly rental; she was living on the Gashland farm which was in her name (the record indicates that litigation is pending as to the ownership of the farm and the personal property thereon); irrespective of ownership of the farm, there are payments to be made on a mortgage thereon in the sum of $2,200 a year until the mortgage indebtedness of somewhere around $9,000 is retired; there were some unpaid bills in connection with plaintiff's living expenses and with improvements made upon and purchases for the farm totalling perhaps as much as $950; plaintiff still has in her possession as her individual property the 1947 automobile, a $2,100 engagement ring, and a $450 fur coat; plaintiff was apparently in good health, has had experience as a model and in operating a beauty shop; she has the custody of and responsibility for the care and rearing of the two small children.
Looking now at defendant's financial condition. If full credence is given to his positive testimony, he was without assets, income, or occupation. However, from the decree and from some remarks of the trial judge made at the hearing on the motion to modify, it is clear that the court did not believe defendant. Our own review of defendant's testimony as to money matters and financial transactions convinces us that the trial court was justified in the belief that a full disclosure had not been made by defendant of all the facts pertaining to the various financial transactions which diligent and proper investigation would disclose. It seems incredible that defendant was not or could not have been better versed concerning the transactions of corporations in which he was an officer and director. It also seems strange that, despite the fact that this case was apparently fully tried at one other time before a different trial judge (who, as heretofore noted, did not enter judgment other than for attorneys' fees and the sum of $200 a month for the support of the minor children, and who then returned the case for reassignment), plaintiff's evidence at this trial failed to show defendant's financial condition was other than that shown in the record. For example, a subpoena duces tecum was served upon defendant to produce records presumably pertaining to the two family corporations. Defendant testified that he could not produce these records because they were not in his control. A similar subpoena was served upon defendant's father. Defendant testified that his father could not appear at the trial because of serious illness. The matter was apparently dropped; no further effort to have produced records from which defendant's financial condition might have been better determined. Cross-examination of defendant concerned: loans at a bank, dealings with a certain Jones & Company, and a power of attorney to defendant's brother relating to certain securities. Questions of plaintiff's counsel indicated that an examination *568 of the stock book and minutes of the Simon Realty Company would disclose that defendant's father held 400 shares of that stock as trustee; for whom, not shown. Despite all these matters, about which questions were asked which showed some prior knowledge on the part of plaintiff and her counsel, no records were produced. The brother, Kenneth Simon, did not appear as a witness; the father did not appear; no official of the bank appeared; no one from Jones & Company appeared.
The evidence points to circumstances which, left unexplained, raise a suspicion that all the facts pertaining to defendant's present financial condition are not known.
But the trial court could not and we may not properly enter monetary judgments based upon suspicion or upon inferences not justified by the evidence. One inference which the trial court indicated he made was that the net proceeds received by Simon Realty Company from the sale of its building were $125,000; and that defendant must have had a 1/10 interest therein, amounting to $12,500. But this inference is not based upon evidence; it is based upon surmise and suspicion. The trial court may have thought that defendant had concealed assets. But any such conclusion must be justified by facts and reasonable inferences from those facts. Possibility and suspicion are not enough.
Based upon this record, we think there was no evidence which justified the award of $25,000 gross alimony, $2,000 attorneys' fees, or $200 per month for the support of the children. We find no reasonable relation between these amounts and the facts then before the trial court. Whether allowances for these items should be made and, if so, the amounts thereof must be determined by the facts in each particular case. Almost invariably certain facts enter into any such determination: the length of the marriage, the respective financial positions of the parties, their ages, health, training, and education, their respective contributions to any accumulations, whether there are minor children and their ages. Carr v. Carr, Mo.Sup., 232 S.W.2d 488, 490[5]; Knebel v. Knebel, Mo.App., 189 S. W.2d 464, 467[6, 7].
We agree with the trial court that the evidence justifies the award of alimony, an allowance for support of the minor children, and for attorneys' fees. However, the allowances made are not supported by the evidence. Our conclusion is that the instant awards, unsupported as they are by evidence, were improperly made and that the making of them amounted to an abuse of the discretion vested in the trial court as to these matters.
We are of the opinion that this case presents a situation in which we should not attempt, upon this record, to fix the amounts for the items in question. We could not do so except arbitrarily. We think it is incumbent upon the parties and their counsel (short of some voluntary disposition by them) to make further efforts to discover additional facts and means of information, and adduce those facts in the trial court at a further hearing to determine: whether alimony should be in gross or from year to year and the amount thereof; a reasonable amount to be allowed for the support of the minor children; and a reasonable amount to be allowed for attorneys' fees. We cannot but believe that such a hearing will throw additional light upon questions involved and furnish a more accurate factual basis for whatever judgments the trial court may enter.
The judgment of the trial court granting to plaintiff a divorce at defendant's costs and awarding to plaintiff the care, custody, and control of the minor children is affirmed.
Those portions of the judgment ordering defendant to pay to plaintiff $200 per month for the suport and maintenance of the minor children, $25,000 alimony in gross, and $2,000 as attorneys' fees are reversed and the cause is remanded for such further action as to these matters as the court and the parties may desire to take.
VAN OSDOL and LOZIER, CC., concur.
PER CURIAM.
The foregoing opinion by COIL, C., is adopted as the opinion of the court.
All concur.