R————————, Plaintiff,
Appellant-Respondent,

v.

M————————, Defendant,
Appellant-Respondent.

Nos. 8271, 8273.

Springfield Court of Appeals.

Missouri.

Nov. 13, 1964.

Veryl L. Riddle, Riddle, O'Herin & Newberry, Malden, for plaintiff, appellant-respondent.

Charles M. Cable, John W. Noble, Bradley & Noble, Kennett, for defendant, appellant-respondent.

HOGAN, Judge.

This is a divorce action. The husband is the plaintiff; the wife is the defendant. The plaintiff filed suit for divorce, stating as his grounds that the defendant had committed adultery and had offered him certain intolerable indignities. The defendant countered with a cross bill for separate maintenance, alleging that the plaintiff openly consorted with other women during their marriage, and charging certain other indignities. Both parties sought custody of their minor children. The trial court has denied a divorce to either party and both have appealed. The two appeals were consolidated in this court.

The plaintiff, at trial time, was 63 years old. He is a funeral director, though not a licensed embalmer, and is the principal officer and director of a corporation which operates funeral homes at Campbell and Malden, Missouri, with sub-offices in other locations. The record indicates that he has been engaged in this business for many years. He is assisted in the operation of this business by Mrs. B., to whom he was formerly married. Mrs. B. is a licensed embalmer, and her duties include "keep-[ing] the books," and "she sees about the funerals and gets records." Mrs. B. is a substantial shareholder in the corporation which operates the funeral business, and the record indicates that during all the time here in question she has been closely associated with the plaintiff in the operation of his business.

In 1945, after the plaintiff and Mrs. B. were divorced, he and the defendant were married. The parties are the parents of three children, a son aged 17, and two daughters, one 16 and the other 12. We infer that all of these children were born before the parties finally separated in 1951. These children now live with their mother. The parties, as we say, have been separated since 1951, and during all this time the defendant and the children have lived in what is best described as an annex to the funeral home—"built under the same roof * * * but different entrances"—while the plaintiff

has continued to live in the adjoining funeral home. The apartment, or annex, in which the defendant and her children reside, consists of a living room, one bedroom, a kitchen and a bathroom. The children sleep in the bedroom, which is partitioned by the use of dressers, while the defendant sleeps in the living room where she "makes out a folding couch" each night. The record indicates that though the plaintiff contributes substantially to the children's support, he otherwise has little contact with them. The plaintiff's position is that the defendant has deliberately alienated the children from him, while the defendant maintains that the plaintiff "just treats them like they were strangers" and "doesn't even recognize them." Thus, whatever the basic source of their difficulties, the parties appear to have lived for the past thirteen years in an atmosphere of considerable hostility at relatively close quarters, substantially without change since their final separation.

The parties in this instance presented evidence of a number of episodes, through which there run, so to speak, a number of recurrent themes. Each expressly accused the other of adultery, and each presented evidence which we must in fairness say tends to support the accusation. The plaintiff's evidence was that the defendant had openly consorted with a number of men, and one of these men, an automobile mechanic, testified that he had seen or been with the defendant "every week or something like that" for a period of "maybe a year." Sometimes this man would be alone with the defendant, and "sometimes the children were with us." This witness positively testified to having sexual intercourse with the defendant on several occasions. Testimony given by the witness' former wife tended to corroborate his evidence.

Another man, who appears to have been an appliance dealer in a nearby city, was also shown to have associated with the defendant in a rather intimate and imprudent fashion, though there is no positive testimony that the defendant ever actually committed adultery with him. The plaintiff's evidence with regard to this man was that his car was seen parked near the defendant's quarters on numerous occasions, and that the defendant had referred to him as her "boy friend." A former police officer testified that on one occasion he saw the appliance dealer go toward the defendant's apartment about 10:00 P.M. and leave about 1:45 A.M., during which time no lights were visible in the defendant's house. Presumably the children were in the house at the time. The defendant categorically denied any improper association with either man.

On the other side of the scale, there is evidence that the plaintiff himself had, on at least one occasion, been guilty of adultery. Though we are inclined, on this particular point, to accept her testimony with some reserve, the defendant stated that during their marriage the plaintiff lived with his former wife "just like he had two wives under the same roof," and further related an incident, which occurred while the plaintiff was in the hospital, when a woman, unknown to the defendant, "walked in and commenced to kissing him [plaintiff] and hugging him and making over him like she was his wife." More substantial, though the plaintiff makes vigorous efforts to avoid its effect, is the testimony of the parties' son, who stated that he had seen his father associating with other women, "walking along the street and eating at the restaurant, talking and driving around together," and that on one occasion, while he was working near his father's sleeping quarters, he overheard his father making love to a young waitress from a local cafe, and that at the time "he [the plaintiff] was having sexual intercourse with her." The plaintiff flatly denied these incidents or any improper association with other women.

It is apparent that the presence of Mrs. B. has produced discord between the parties. Again and again some mention of the hostile feeling between the defendant and the plaintiff's former wife appears. The plaintiff's view is that Mrs. B. has been a trusted and necessary employee; she ap-

pears to be in charge of one of the funeral homes in which the plaintiff is interested, and she is a substantial shareholder in the corporation which owns and operates the funeral homes. Exhibits introduced at the trial make it appear that at one time or another she has either invested or loaned a considerable amount of money to the corporation, and the corporation is now indebted to her. The defendant, on the other hand, understandably regards Mrs. B. as a rank and most unwelcome intruder. Indeed, a substantial part of the parties' immediate difficulty seems to have sprung from the fact that the plaintiff, by incorporating his assets and by agreeing that his corporate shares shall be transferred to the other shareholders for cash upon his decease—the record indicates that he has been seriously ill—has effectively put his assets into Mrs. B.'s hands and out of reach of defendant and her children. In this respect, we agree that she may have some cause for concern.

On at least one occasion, the defendant and Mrs. B. have openly fought. The plaintiff's version of this incident is that the defendant made a wholly unprovoked assault on Mrs. B., and in the process not only injured Mrs. B. but called her an "old whore and son-of-a-bitch." The defendant maintains that the altercation was wholly provoked by Mrs. B.

Each party has accused the other of physical abuse, in some degree. The defendant testified that on several occasions the plaintiff had assaulted her without provocation. At one time, the defendant said, after she and Mrs. B. had engaged in some kind of argument, or had had some difference which angered Mrs. B. and Mrs. B. threatened to leave, "he [plaintiff] put his hands around my throat and hit my head against the wall and he said 'I'll kill you for running my embalmer off.'" On another occasion, while the children were small, the plaintiff attacked the defendant after she had remonstrated with him because of his neglect of the children, and "threw me down on a trunk and give me a good beating." Once while the defendant was burning trash the plaintiff, having become angered over some matter, attempted to run the defendant down with a truck or an automobile, and the defendant testified that on one occasion the plaintiff had pointed a pistol at her and had threatened to kill her. The plaintiff has positively denied mistreating his wife. His testimony on this subject was that he "never touched her. I never beat her up." On one occasion, the plaintiff testified, the defendant threatened to break all the glass out of one of his funeral coaches, and because of the ensuing altercation he "paid a fine," but did so only "to satisfy her [defendant]."

Repeated reference is made to the plaintiff's indifference to the children. The plaintiff himself testified that the children "don't even recognize me." Being asked why the children "have not been friendly * * * for the past few years," the plaintiff answered, "they do whatever she [defendant] tells them." While there is no question, as we have said, that the plaintiff has contributed substantially to the children's support, the children themselves apparently consider that he is indifferent to them, for the parties' son and their older daughter testified that he seldom speaks to them, and they obviously have the impression that he considers them inferior and not worthwhile. The plaintiff concedes that the defendant alone has reared the children, although he denies that she has "done a good job." The plaintiff's proof, in fact, is to the effect that the defendant has deliberately encouraged and assisted their son in stealing money from the funeral home over a considerable period of time and in substantial amounts, and indeed there is evidence that he may have done so, though both the son and the defendant categorically deny it. The defendant, on the other hand, believes that plaintiff's attitude toward the children has been influenced by his former wife, even though she says that he refuses to associate with them, and "just treats them like they were strangers." At all times, defendant says, "I have tried to teach them to love him and respect him."

It must be said that the parties have made some attempt to resolve their differences. Though the subject is not very fully developed in the record, it appears that in 1953 the defendant brought a separate maintenance action against the plaintiff, which was either unsuccessful or was voluntarily dismissed, and it also appears that at some later time, possibly in 1961, the parties entered into a written separation agreement in an attempt to settle their property rights. These attempts to resolve their differences have, like the parties' whole marital career, been frustrated by their mutual suspicions and hostility. It appears that by the terms of this agreement the plaintiff is obligated to pay the defendant a fixed sum for support and maintenance, and to provide her with different and presumably more adequate quarters; he has testified that he has attempted to comply with the agreement. The defendant appears deeply suspicious of the plaintiff's motives in effecting the agreement, for he seems contemporaneously to have incorporated his assets, as we have said, and to have arranged for his former wife to become a substantial shareholder. The shareholders have apparently agreed that upon the death of any shareholder, his stock will be transferred to the remaining shareholders in return for a specified sum to the deceased shareholder's estate, and the defendant regards both the separation agreement and the corporate agreement as having been "made with bad intentions." The defendant believes that the plaintiff's mind has been affected by the disease or illness from which he has suffered, and believes that "they [presumably Mrs. B. and her husband] are trying to get hold of his property, his money and all of his property * * * so they will have their access to him."

Both parties, we must say, produced apparently credible witnesses who testified to their good character.

Both parties make a number of arguments designed to avoid the impasse at which they find themselves. The defendant argues that evidence of adultery committed by her should not have been received and should not be considered by us, because the petition alleged only acts of adultery occurring before the parties' separation in 1951 while the acts proved occurred in 1956.

■ As a point of pleading, we consider the defendant's objection to have some merit. The petition alleged dates only in connection with the marriage, separation and birthdays of the children. The only averment alleging the commission of adultery is that the defendant "did commit adultery." Neither the time and place of the offense nor the person with whom it was committed is stated, and ordinarily adultery must be alleged with such certainty of averment as to time, place and person as will enable the person charged to meet the allegations with proof.[1] Though there are a good many exceptions and limitations to this rule of pleading,[2] we are of the view that the defendant was entitled to a more definite statement of the charge of adultery than was contained in this petition, and that the part of the petition charging adultery would probably have been subject to a motion for more definite statement as provided by Rule 55.34.[3]

The theory of the plaintiff's action is clear, however, and the jurisdictional facts are alleged. While the plaintiff's averment of adultery is seriously deficient, it is joined with allegations of indignities, and the petition as a whole stated a cause of action. The defendant did not move the trial court for a more definite statement, so far as the

1. Poole v. Poole, 221 Iowa 1073, 265 N.W. 653, 658–659 [8]; Freeman v. Freeman, 39 Minn. 370, 40 N.W. 167; Anno., 2 A.L.R. 1621, 1622 I (1919); 17 Am.Jur., Divorce and Separation, §§ 336–338, pp. 499–501; 27A C.J.S. Divorce § 108b, pp. 373–374.

2. See Anno., supra, 2 A.L.R. at 1628–1631.

3. All references to statutes and rules are to RSMo (1959) V.A.M.S. and V.A.M.R., except as otherwise noted.

record shows, but pleaded over to the merits. The only complaint defendant has in respect to the charge of adultery is the want of specification of the acts constituting the charge, and though that complaint is substantial, we believe it was waived by failure to object by motion.[4]

■■■ The plaintiff argues that defendant has condoned any misconduct of which he has been guilty. His argument on this point is somewhat diffuse, but he appears to contend that by executing a separation agreement the defendant has condoned any breach of the marital obligation on his part. We believe we must reject this argument, primarily because we cannot find any evidence in the record before us to support it. To establish condonation, some evidence must appear which shows an intent to forgive and become reconciled with the offending spouse,[5] and we find no evidence of any conciliatory spirit on the part of the defendant. Despite her testimony that she "intends to see that he [plaintiff] is taken care of," we are unable to perceive anything in her course of conduct indicating her intention to forgive the plaintiff or to restore the marital relation. So far as the record shows, the separation agreement amounts only to a voluntary agreement to live separately and apart. Since the agreement itself is not in the record (though we are assured that it was executed in writing) we cannot know what the parties recited therein about their past grievances, but such authority as we have found on the point indicates that the fact that the parties agreed to live apart under articles of separation would not in itself imply condonation of past offenses, Potts v. Potts, N.J.Ch., 42 A. 1055, 1058; Fosdick v. Fosdick, 15 R.I. 130, 23 A. 140, 141; Anno., 32 A.L.R.2d 107, 147 (1953), nor amount to a connivance at the plaintiff's subsequent adultery, Donohue v. Donohue, 159 Mo.App. 610, 613, 141 S.W. 465, 466 [3, 4]; Anno., 17 A.L.R.2d 342, 371–372, Section 15, which we consider to be established by substantial evidence.

■■■ The parties have energetically advanced a number of other arguments which we have carefully considered. It is our view, however, that the merits of this appeal cannot be resolved along the lines they propose. It is familiar learning that while our statute enumerating the causes for divorce (Section 452.010) speaks in terms only of the "injured" party, a divorce may be granted only if the party seeking it affirmatively shows that he is both an injured and "innocent" party.[6] Of course the requirement of "innocence" means only that the applicant must show that he himself has not committed any offense which is a cause for divorce.[7] Nevertheless, the burden of showing "innocence" is an affirmative burden,[8] and though the cross bill here

4. Empire Storage & Ice Co. v. Giboney, 357 Mo. 671, 677–678, 210 S.W.2d 55, 58–59 [4, 5], aff'd. 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Hamilton v. Linn, 355 Mo. 1178, 1182, 200 S.W.2d 69, 71 [9, 10]; State ex rel. and to use of Brancato v. Trimble, 322 Mo. 318, 322, 18 S.W.2d 4, 5 [3, 4]; Kreisman v. Kornfeld, Mo.App., 208 S.W.2d 79, 81–82 [1, 2]; see Conant v. Conant, 10 Cal. 249, 254.

5. Pobst v. Pobst, Mo.App., 317 S.W.2d 655, 660–661 [2] [3, 4]; Forbis v. Forbis, Mo.App., 274 S.W.2d 800, 808–809 [31–35]; Weber v. Weber, 195 Mo. App. 126, 132, 189 S.W. 577, 579 [5]; 1 Nelson, Divorce and Annulment, § 11.-01, pp. 373–374 (2d ed. 1945); 17 Am. Jur., Divorce and Separation, § 230, p. 415.

6. Franklin v. Frankin, 365 Mo. 442, 446, 283 S.W.2d 483, 485–486 [6–8]; Simon v. Simon, Mo., 248 S.W.2d 560, 562 [1]; Hoffman v. Hoffman, 43 Mo. 547, 549; Cody v. Cody, Mo.App., 233 S.W.2d 777, 781 [5]; Chapman v. Chapman, Mo. App., 230 S.W.2d 149, 151 [3, 4].

7. Simon v. Simon, supra, 248 S.W.2d at 563 [2, 3]; Hoffman v. Hoffman, supra, 43 Mo. at 549; Langshaw v. Langshaw, Mo.App., 331 S.W.2d 15, 18 [2]; Chapman v. Chapman, supra, 230 S.W.2d at 151 [3, 4].

8. Simon v. Simon, supra, 248 S.W.2d at 562[1]; Fudge v. Fudge, Mo.App., 355 S.W.2d 381, 382–383 [2, 3]; Ezell v. Ezell, Mo.App., 348 S.W.2d 592, 597–599 [11, 12]; Ellebrecht v. Ellebrecht, Mo. App., 243 S.W. 209, 210 [3].

is for separate maintenance, the burden of proof is substantially the same.[9] And whether on petition or upon cross bill, if the party seeking relief has himself been guilty of conduct which would entitle the opposite party to a divorce, he or she must fail, notwithstanding the evidence might be otherwise sufficient. Hoffman v. Hoffman, supra, 43 Mo. at 551; Gruner v. Gruner, 183 Mo.App. 157, 177–178, 165 S.W. 865, 871. What each party proved here was essentially recriminatory matter—counter accusations—the effect of which was not to exonerate the offending spouse but merely to prevent the injured opposite from being "innocent" within the meaning of the law. Of course, as the defendant points out, if "both parties have been guilty of adultery," then the statute in terms forbids granting a divorce, Section 452.030; but it has also been clear from an early day that any ground of divorce may be recriminated, or offset, so to speak, by any other, Nagel v. Nagel, 12 Mo. 53, 56–57, and therefore even if we set aside the testimony tending to prove an adulterous act on plaintiff's part, as he urges we should, still no divorce can be granted if he has offered the defendant indignities within the meaning of the statute, Section 452.010. Unless the trial court's implied finding that both parties are guilty of misconduct amounting to a cause for divorce is "clearly erroneous" [Rule 73.01(d)], we must affirm the judgment, because we cannot compare the parties' conduct in relative terms and award a divorce or decree of separate maintenance to the one least at fault; the

doctrine of "comparative rectitude" does not obtain in this state.[10]

The plaintiff argues, with considerable logical force, that the marriage relation here is "as dead as the ashes of a long forgotten campfire," and forthrightly suggests that it would be in the best interests of the parties and the state if the marriage relation were dissolved, regardless of fault. Possibly so. It has been cogently argued that the whole idea of mutual recrimination, and the principle that if both parties are at fault neither may have a divorce, are unrealistic anachronisms, leading to an increase in migratory divorce and hypocritical evaluation of the evidence in appellate opinions to avoid the force of these doctrines.[11] Such superficial research as we have done indicates that nearly half the American jurisdictions now allow divorce simply pursuant to separation for a specified time.[12] Generally, under these statutes, it is held that the separation must have been voluntary in its inception or have become so by acquiescence, but a divorce can ordinarily be granted without regard to marital fault; that is, it is not necessary that the party seeking a divorce be either without fault or be the "innocent and injured" party.[13] The public policy of these statutes is said to be " * * * that where a husband and wife have lived apart for a long period of time, without any intention ever to resume conjugal relations, the best interests of society * * * will be promoted by a dissolution of the marital bond." Anno., supra, 51 A.L.R. at 764. Were the so-called "policy decision" ours, we think we could agree that the

9. Glick v. Glick, Mo., 372 S.W.2d 912, 915 [8–10]; Ellis v. Ellis, Mo., 263 S.W.2d 849, 853 [3, 4]; Forbis v. Forbis, supra, 274 S.W.2d at 807 [24–28]; Meredith v. Meredith, Mo.App., 166 S.W.2d 221, 223 [1]; Anno., 49 L.R.A.,N.S., 86. Cf. Pickel v. Pickel, 291 Mo. 180, 204–205 (V), 236 S.W. 287, 293–294 [3], indicating that separate maintenance is actually a remnant of the action for divorce from bed and board.

10. Nagel v. Nagel, supra, 12 Mo. at 56; Coons v. Coons, Mo.App., 236 S.W. 358, 359 [1, 2]; Barth v. Barth, 168 Mo. App. 423, 427, 151 S.W. 769, 770–771

[2]; see Aschemeyer, Some Aspects of Missouri Divorce Law, 27 Mo.L.R. 332, 352–353 (1962).

11. See Weinstein, Proposed Changes in the Law of Divorce, 27 Mo.L.R. 307, 313–322 (1962).

12. Note, Living Apart Statutes as a Replacement for Fault, 1959 Wash.U.L.Q. 189.

13. Annots., 51 A.L.R. 763 (1927); 97 A.L.R. 985 (1935); 111 A.L.R. 867 (1937); 166 A.L.R. 498 (1947). The statutory provisions do vary considerably; they are summarized and compared 1959 Wash.U.L.Q. at 205.

perpetuation of the marriage in this case serves no useful purpose, either for the state or for the parties. Certainly it does nothing to alleviate the appalling situation in which these litigants and their children find themselves merely to say that since neither is without fault, we must leave them to "their common remedy in common humiliation, and mutual forgiveness."

 It is clear, however, that divorce in this state is a wholly statutory proceeding, State ex rel. Couplin v. Hostetter, 344 Mo. 770, 775–776, 129 S.W.2d 1, 4 [8], and we may not broaden the statutory provisions judicially. Ezell v. Ezell, supra, 348 S.W.2d at 597; Chapman v. Chapman, supra, 230 S.W.2d at 150–151; Allen v. Allen, Mo.App., 60 S.W.2d 709, 712 [8]. As we have noted, we believe that in this situation, as in a case where both parties seek a divorce, the rule is that if both parties are entitled to a decree, then neither may have it. We are not prepared to say that there is no credible evidence tending to prove that both parties have been guilty of adultery; rather, we believe there is substantial evidence to show that both have, and in that case the language of the statute forbids granting of a divorce. Section 452.030. We need not, for the purposes of this opinion, consider all the inferences possible from the facts adduced, but even if we set aside or ignore the evidence of plaintiff's adultery as the fabrication of a resentful adolescent, as the plaintiff urges, still we could not say there is clear error in refusing him a decree. During all the time plaintiff and defendant were married, the plaintiff's former wife was not only in close proximity but worked in close association with the plaintiff. The jealousy, suspicion and resentment which this aroused on the defendant's part is evident, and probably natural. The defendant believed, and testified, that plaintiff deferred to his former wife, and that on one occasion plaintiff attacked her, the de-

fendant, because she had angered Mrs. B. The defendant's evidence was that when she was separated from the plaintiff and given her present quarters, she was obliged to keep house with Mrs. B.'s castoff furniture, while plaintiff's former wife was furnished with more comfortable quarters across the street. The defendant was obliged to remain completely away from the funeral home because the plaintiff feared conflict between the two, and on at least one occasion Mrs. B. and the defendant fought openly. Finally, at least from the defendant's viewpoint, it appears that the plaintiff has in effect placed his assets in Mrs. B.'s hands and out of the reach of the defendant and her minor children. We do not say, nor mean to infer, that there is any very convincing evidence indicating an adulterous relationship between the plaintiff and his former wife. At the same time, we consider it entirely reasonable to say that plaintiff's long continued and close association with his former wife, and his deference to her wishes and feelings, over the defendant's objections, constitute a course of conduct "subversive of the family relationship," amounting to indignities and grounds for divorce.[14] In such a view of the facts, the plaintiff's charge of adultery stands offset or recriminated by such indignities.

We do not comment, nor mean to comment, upon the moral aspects of this situation. We do not know, nor can we determine, the original sources of discord between the parties. Whatever they were, they have been aggravated and intensified by years of estrangement and hostility, vigorously refreshed and renewed on many occasions. It does appear that both parties have grounds for divorce, and therefore a decree must be refused to both of them. The judgment must therefore be affirmed.

RUARK, P. J., and STONE, J., concur.

14. Baldwin v. Baldwin, 151 Fla. 341, 9 So.2d 717, 721 [4] [5]; Craig v. Craig, 129 Iowa 192, 105 N.W. 446, 448, 2 L.R.A.,N.S., 669; Farley v. Farley, 278 Mich. 361, 270 N.W. 711, 712–713 [1], 109 A.L.R. 678; 17 Am.Jur., Divorce and Separation, § 87, pp. 310–311.