[No. 32139. Department One. June 26, 1952.]

FRANK B. WISSINK, *Respondent,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Defendant,* NORTHWEST MAGNESITE COMPANY, *Appellant.*[1]

*John T. Raftis,* for appellant.

*Theodore M. Ryan* (of *Lindberg & Ryan*), for respondent.

GRADY, J.—The Northwest Magnesite Company has appealed from a judgment of the superior court for Stevens

[1]Reported in 245 P. (2d) 1006.

county entered upon the verdict of a jury. The jury found that the department of labor and industries had not made a sufficient award to respondent for injuries he had sustained, and made an additional award of 30% permanent partial unspecified disability.

The appellant assigns as error the denial of its motion for a judgment notwithstanding the verdict, or in the alternative for a new trial, but its main argument is directed to the former.

On April 14, 1949, the respondent, while in the employ of appellant, caught his right arm in a pulley, and it was severed at the elbow. There was a ripping, or avulsion, of the muscles of the upper arm into the end of the shoulder blade; also an avulsion of the subscapular muscles that attach on the arm and go back to the shoulder blade. The arm was amputated by a surgeon. He stated the amputation was to about three inches below the shoulder. The doctors who made a report to the department of labor and industries stated that after the amputation there remained a 6¼ inch ulnar stump. It appears from the report that because of the shortness of the stump some difficulty was encountered in fitting an artificial arm, though the new one appeared to be well fitting and claimant was obtaining fairly good use from it. The department made the same award for permanent partial disability as it would have made for total amputation of the arm at the shoulder, and a further award of 15% of the maximum allowed for an unspecified disability.

At the hearing before the appeal board, respondent testified that since his claim was closed on December 3, 1950, his shoulder had been continuously sore and that it ached and hurt him all of the time; that he has had the pain in the shoulder ever since he was injured; that the pain was much worse when he tried to lift anything; that he also had neck and head pains with stiffening of the neck along with such pains; that the more he worked the pains would increase, and that he had none of these difficulties prior to his injury.

Dr. John E. Blair stated he attended respondent when he was injured; that he amputated the arm and treated respondent thereafter; that upon receipt of a report from specialists he gave respondent shots for arthritis in the right shoulder; that immediately following the injury respondent's shoulders were very stiff, but this condition had improved; that he examined respondent a few days before the hearing and found there was a considerable amount of atrophy of the muscles of the shoulders. The doctor explained that nonuse of muscles will result in atrophy; that if at the time of the injury sustained by respondent the muscles underneath the scapula were torn off, very little could be done in the way of treatment of his condition, but there was a possibility that if the muscles were exercised they might improve. He expressed doubt about muscle improvement because of increased atrophy. He gave his opinion that respondent had unspecified disability rating in the vicinity of his shoulder. He called attention to the rating of 15% by the department and stated he thought respondent should have a rating of 30% or 40% or more.

The doctor admitted he had not had any experience in rating disability cases, and that it would be very difficult to rate a disability of the kind suffered by respondent. He stated that he would have to base rating on the original injury and the fact there was so much of a tearing of the muscles; also that respondent had a pretty good function of the shoulder, but considering the amount of the injury sustained, he thought 15% was a little low. He was asked if he based the 15% disability on "speculation and conjecture." His answer was: "I am sorry, but that's so, that's what I am doing because I don't know what 15% or 20% is." He was then asked: "You know of no definite standard in your training upon which you can evaluate these injuries?" His answer was: "No. As a matter of fact the man can't do any work so he is really 100%." The doctor said he thought any arthritis in the shoulders came as a result of the injury sustained by respondent, but the only way a causal connection between the arthritis and the in-

jury could be determined was by X rays taken before such injury and at the present time, and this had not been done. The following then occurred:

"Q. In other words, that would be what you would call speculation and conjecture, would that not be true? A. Yes. My whole feeling in this relative to the shoulders is on the atrophy of the muscles. If you look at the man you can see it, the muscles are gone. Q. Would that condition be a direct result of his injury that was known at the time the award was made here last fall? A. I think it has been a progressive condition. It is my feeling that the atrophy is a result of the injury. Q. It isn't something that has arisen independent of the injury or aggravation since? A. No, it is a direct result of the injury. . . . Q. With the exception of the atrophy of the muscles, have you found anything objectively to substantiate the complaints of pain in the neck and the headaches that this man has? A. No."

The appellant bases its claim that it was entitled to have been awarded a judgment notwithstanding the verdict of the jury upon the theory that the medical witness who testified for respondent was not qualified to express an opinion upon disability rating; that his opinions were based upon speculation and conjecture, and that his testimony did not in any way disprove the findings of the physicians who testified in behalf of the department and appellant.

We approach the theory of appellant having in mind that we must view the evidence submitted by respondent in a light most favorable to him and draw all permissible inferences in our interpretation of the evidence submitted. We must also treat the decision of the department as being *prima facie* correct.

We are in accord with the view of appellant that the evidence does not show any causal connection between any arthritic condition of the shoulders of respondent or the neck pains and headaches of which he complained and his original injury. The disability rating must be based upon the atrophy of the respondent's muscles, resulting from the nonuse thereof as a result of the injury sustained, and the pain and soreness in the shoulder.

██ We cannot accept the view of appellant that Dr. Blair was not qualified to give an opinion upon disability rating. In industrial insurance cases, permanent partial disability is rated on a percentage basis. There is no fixed standard by which the percentage of disability can be determined. Medical men are the only ones considered qualified to give an opinion on the amount of disability in terms of percentage.

We do not think Dr. Blair disqualified himself from expressing an opinion upon the extent of respondent's disability caused by atrophy of muscles merely because he frankly stated that he thought the 15% disability found by the department was based upon speculation and conjecture when such question was directly asked of him. He gave his personal opinion in the form of an estimate, which necessarily must be the case when medical witnesses attempt to rate disability in terms of percentage. All they can do is to give their very best judgment based upon knowledge they have of a patient and the injuries sustained.

Dr. Blair had been consulted by respondent on various occasions prior to his injury. The doctor was called to attend respondent immediately after he was injured, amputated his arm, attended him thereafter, was familiar with his progressive condition, and examined him a few days before the hearing. The progressive atrophy of the muscles was apparent to him and was an objective symptom. It is our opinion that Dr. Blair was qualified to estimate the percentage of permanent partial disability of respondent resulting from the injury he sustained, and his credibility and the weight to be given his testimony was for the jury to determine.

██ The testimony given by Dr. Blair and that given by other medical experts was in conflict. The opinions given by Dr. Blair impressed the jury greater than those expressed by the other medical experts and were the ones accepted. This was within the province of the jury. If we held the weight of the evidence was contrary to the verdict, we would become triers of fact and be substituting our

judgment for that of the jury. The trial court correctly decided there was sufficient competent evidence to take the case to the jury. As the record stood, only discretionary grounds could be urged as a basis for a new trial. We find no reason to disturb the action of the court in denying the motion.

The judgment is affirmed.

SCHWELLENBACH, C. J., MALLERY, DONWORTH, and WEAVER, JJ., concur.