[No. 32549. Department One. January 28, 1954.]

KATHARINA BERNDT, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES *et al., Respondents.*[1]

*F. W. Loomis,* for appellant.

*The Attorney General, Henry Heckendorn* and *Roger K. Garrison, Assistants,* for respondent department of labor and industries.

[1] Reported in 265 P. (2d) 1037.

*Donley & Ingram*, for respondent Harbor Plywood Corporation.

HILL, J.—This is not just another heart case. Appellant seeks to lead us to a position beyond any which this court or any other, so far as we have found, has yet taken in the matter of attributing death from a heart condition to an industrial injury or occupational disease.

Curt Berndt, a plywood worker, contracted an acute dermatitis from the glue with which he came in contact in the course of his employment. Its extent and character is graphically described in a hypothetical question hereinafter quoted; suffice it to say here that it was disabling and he was off work from March 13, 1948, to May 3, 1948, a little less than two months. He resumed his employment on the latter date and continued to work to and including August 6, 1948, the day of his death. The dermatitis had pretty well healed except on his genitals. There, although the condition had improved from time to time, it had always become worse again, and the skin was "raw and weeping" at the time of his death. Death occurred as the result of a coronary thrombosis while he was mowing his lawn.

The widow claims a pension under our workmen's compensation act because (1) her husband, a workman under the act, contracted an acute dermatitis which is conceded to have been an occupational disease within the purview of the workmen's compensation act and which (2) caused him to worry (emotional stress and strain), which worry (3) caused the coronary thrombosis which (4) caused his death.

The only emotional stress referred to in the hypothetical question, hereinafter more fully discussed, is this sentence:

"He was greatly humiliated and concerned that his wife might believe that he had been untrue to her and contracted a private disease."

Appellant's expert concluded that

". . . the main contributing element towards the incidence of an acute coronary thrombosis is the emotional stress and strain involved in this case by the dermatitis which this man had."

His concept as to the basis of the emotional stress and strain is found in two quotations from his answers on cross-examination:

"If he was afraid that his wife thought that he had a social disease, as was stated to me, certainly even though the generalized dermatitis was relieved, the fact that the localized dermatitis remained might have been of considerable emotional import to him. It is conceivable that that was the most emphatic part of his emotional insecurity."

"Now if you have a man who has had an acute dermatitis which has persisted for a long period of time and which was so severe as to cause him to worry about his own domestic security as well as his economic security, and has distressed him so that he couldn't even bear a sheet over him, then of course you have a very profound emotional factor which caused no doubt some constriction of the coronary artery—in this case probably which had been previously diseased. But they aggravated, as we can say, probably a pre-existing condition and that caused it."

Based upon her expert's testimony, it is the position of the appellant here that, while the dermatitis did not cause the coronary thrombosis which resulted in Mr. Berndt's death, the emotional stress and strain (which finally boils down to worry or emotional insecurity, with emphasis on the fear that his wife thought he had a social disease) was "the main contributing element" to the incidence of the coronary thrombosis.

There is no contention that the occupational disease was in and of itself the cause of the coronary thrombosis. The so-called heart cases, in each of which a disabling or fatal heart condition was found to be the almost immediate result of shock or exertion, slight or great, in the course of employment, do not control. See *Merritt v. Department of Labor & Industries*, 41 Wn. (2d) 633, 251 P. (2d) 158 (1952), and cases there cited.

There is no contention that the worry (mental or emotional stress) was itself disabling or compensable. The cases in which death resulted from acts committed by a workman while insane, when the insanity was caused by the injury or the pain resulting therefrom, as in *Hepner v. Department*

*of Labor & Industries,* 141 Wash. 55, 250 Pac. 461 (1926); *Gatterdam v. Department of Labor & Industries,* 185 Wash. 628, 56 P. (2d) 693 (1936); *McFarland v. Department of Labor & Industries,* 188 Wash. 357, 62 P. (2d) 714 (1936); and *Karlen v. Department of Labor & Industries,* 41 Wn. (2d) 301, 249 P. (2d) 364 (1952), obviously are not in point. Nor are the cases in which a disabling mental condition caused by and directly attributable to an injury was the disability for which compensation was claimed. *Peterson v. Department of Labor & Industries,* 178 Wash. 15, 33 P. (2d) 650 (1934), traumatic neurosis; *Husa v. Department of Labor & Industries,* 20 Wn. (2d) 114, 146 P. (2d) 191 (1944), traumatic neurosis; *Anderson v. Department of Labor & Industries,* 23 Wn. (2d) 76, 159 P. (2d) 397 (1945), traumatic neurosis; *Jacobson v. Department of Labor & Industries,* 37 Wn. (2d) 444, 224 P. (2d) 338 (1950), schizophrenia.

A distinction is recognized quite generally as to the status of claims under workmen's compensation statutes between a situation in which, as in the cases just cited, the injury or disease has a direct effect (including traumatic neurosis) upon the nervous system, and a situation in which the mental disturbance is collateral to the injury and does not arise directly from it but is due to worry, anxiety, or brooding over the accident or its effect or compensation for it or the like. *Coffey v. Coffey Laundries,* 108 Conn. 493, 143 Atl. 880 (1928); *Kowalski v. New York, New Haven & Hartford R. Co.,* 116 Conn. 229, 164 Atl. 653, 86 A. L. R. 957 and annotation at p. 961 thereof; *Schneyder v. Cadillac Motor Car Co.,* 280 Mich. 127, 273 N. W. 418 (1936); *Thompson v. Railway Express Agency,* 236 S. W. (2d) (Mo. App.) 36 (1951).

Our present case, however, presents a much more remote field of worry (emotional stress and strain) than any suggested in the cases we have examined. Here the major emphasis is on the workman's worry about the possibility that his wife suspected him of infidelity, together with some reference to worry about economic security. (If this latter had any relation to the dermatitis, it must have been worry about the inadequacy of awards for disability under the

workmen's compensation act, for there is no suggestion that the workman's time loss in consequence of the dermatitis was not compensable.)

Everyone recognizes that there is an interrelation between worry and bodily ills. The supreme court of Florida said in a divorce action, *Baldwin v. Baldwin,* 151 Fla. 341, 353, 9 So. (2d) 717 (1942), that worry "affects every vital organ and probably results in more mental and physical wrecks than any other one affliction." It remains open to question, however, whether all the ills that an injured workman or one suffering from an occupational disease can worry himself into, particularly when those worries relate to his personal affairs, are, or were intended to be, covered by the various workmen's compensation statutes. It is suggested in *Thompson v. Railway Express Agency, supra,* that a psychoneurosis brought about by worries over an unhappy domestic situation or finances should not be compensable.

The one case that even approaches the position contended for by the appellant is *Hoage v. Royal Indemnity Co.,* 90 F. (2d) 387 (1937), and it does not come very close. A claim adjuster for an indemnity company had been required for eight or nine months prior to his collapse, to handle more than double the usual case load. A doctor who had examined him testified that he had a pre-existing arteriosclerosis and that overwork, worry due to failure to keep his work up, and the emotional strain in connection therewith, produced a spasm in a susceptible coronary artery and resulted in the disturbance of the vasomotor system, bringing about angina pectoris and a resultant complete disability. The court said:

"We think that the testimony in the record fully considered tends to show that Mr. Rennie by reason of mental strain, worry, and long and excessive hours of labor suffered a collapse which resulted in his total disability as found by the Deputy Commissioner. We think this collapse constituted an accidental injury within the purview of the statute. His case is comparable to that of a manual laborer whose heart collapses as a result of long continued physical strain or overwork resulting from excessive exertion. . . .

"In the present case we are convinced that the claimant suffered a severe spasm of the heart muscle which occurred

on May 5, 1934, caused by angina pectoris and that this was the consequence of overwork and physical and mental strain required of the employee by the employer, and resulted in coronary thrombosis, and that this sequence brought the case within the act. It is well known that nervous shock, continued anxiety, and excessive exertion at work under trying circumstances may contribute toward the collapse of persons who are already suffering from hardening of the arteries."

In that case, *the physicians who testified had treated or examined the claimant,* and there was emphasis upon "excessive exertion" and "long and excessive hours of labor." To the extent that worry was a factor, *it was worry about his work and his inability to keep abreast of it.*

(*Hoage v. Royal Indemnity Co., supra,* is further to be distinguished by pointing out that it was there determined that the claim adjuster's collapse constituted an "accidental injury" under the longshoremen's and harbor workers' compensation act, 33 U. S. C. A. (Sup.) §§ 901-950. There is a question as to whether the claim adjuster's condition would come within the definition of "injury" in our workmen's compensation act. See RCW 51.08.100. It should be noted, further, that in the determination of the causal relationship under the longshoremen's and harbor workers' compensation act, the concept of proximate cause is not applied. *Southern Stevedoring Co. v. Henderson,* 175 F. (2d) 863 (1949), and cases therein cited.)

In the present case, in neither the briefs nor the oral argument was emphasis placed upon the question of whether worry about purely personal matters, such as the workman's domestic and economic security, can be a link in a causal chain to establish proximate cause between an industrial injury or occupational disease and a disabling or fatal heart condition. However, the respondents have stressed the weakness of the link of worry (emotional stress and strain) in the causal chain due to the time element, three months having elapsed between the date the workman was able to return to his employment and the date of the coronary thrombosis.

There are so many conditions entirely independent of industrial injuries and occupational diseases that can occasion a disabling or fatal heart condition, and the determination of proximate cause is beset with so many uncertainties, that experts in their testimony and courts in their decisions have stressed shortness of the period between the industrial injury or disease and the disability or death due to a heart condition as a persuasive factor as to the causal relationship between the two. As we said in *Petersen v. Department of Labor & Industries,* 40 Wn. (2d) 635, 638, 245 P. (2d) 1161 (1952):

"Where death follows a tangible happening immediately, the time element is persuasive to a layman of the existence of a causal relationship, rather than a bare coincidence. It is also significant to the expert medical witness."

Mental and emotional stress and strain not arising from injuries have been recognized as the inducing cause of compensable disability and death in both heart and brain cases in several states, but always there has been emphasis upon the time element. *Klein v. Len H. Darling Co.,* 217 Mich. 485, 187 N. W. 400 (1922); *Geltman v. Reliable Linen & Supply Co.,* 128 N. J. L. 443, 25 A. (2d) 894, 139 A. L. R. 1465 (1942); *Van Ness v. Borough of Haledon,* 136 N. J. L. 623, 56 A. (2d) 888 (1948); *McNees v. Cincinnati St. R. Co.,* 90 Ohio App. 223, 101 N. E. (2d) 1 (1951); *Reynolds v. Public Service Coordinated Transport,* 21 N. J. Super. 528, 91 A. (2d) 435 (1952).

The *Van Ness* and *McNees* cases, *supra,* are typical of this group of cases. In the former, a borough marshal died from a coronary occlusion caused by excitement. He had driven a borough police car to an ambulance station for the purpose of ordering an ambulance to the scene of a highway accident, and had started back to the scene of the accident followed by the ambulance when he collapsed.

"The evidence is entirely convincing that the immediate cause of the officer's death was a coronary occlusion induced by emotional and nervous strain attending the performance of his duty."

And in the *McNees* case, the driver of a trolley bus operating in a dense fog collapsed over the wheel and died from coronary thrombosis. A verdict denying recovery under the Ohio workmen's compensation act was predicated upon an instruction which the jury must have understood to mean that, if the workman came to his death as a proximate result of a coronary thrombosis which at the time of death was either activated by or brought into existence by mental stress or nervous excitement, such death would not be compensable even though the strain and nervous excitement was produced by the unusual condition under which the decedent was at the time compelled to work. This instruction was held to be prejudicially erroneous, and it was held that death under such circumstances would be compensable under the act.

As we have indicated, it is the contention of the respondents that the worry (emotional stress and strain) must have been greater while the dermatitis was acute and disabling than it was during the three months immediately preceding the coronary thrombosis. Again the *Hoage v. Royal Indemnity Co.* case, *supra,* comes closest to the appellant's position, and again there is a marked distinction—the claim adjuster's cause of worry was constantly increasing as he constantly fell farther behind in his work. And again we call attention to the fact that overwork and overexertion, rather than worry, were the principal causative factors in that case.

We have found no case in which the cause of a coronary thrombosis was attributed solely or principally to emotional stress and strain in which the time between the incidence of the stress and strain and the occurrence of the coronary thrombosis was not very short.

We have discussed at some length *what* must be the basis of the emotional stress and strain and *when* its incidence must occur with relation to a coronary thrombosis to make that stress and strain an acceptable link in the causal chain leading to the coronary thrombosis. These questions have been discussed because we feared that, by ignoring them, we might seem to acquiesce in the appellant's position with ref-

erence to them, which position, as we indicated in our opening paragraph and have amplified in the intervening pages, is beyond any which this court has heretofore taken. However, we are not, in this case, called upon to determine either the *what* or the *when*, and consequently do not pass upon those questions.

We come now, at long last, to the question of whether, leaving all other considerations aside, the testimony of Dr. J. Harold Brown, who never saw Curt Berndt, alive or dead, established that Berndt's occupational disease was the proximate cause of the coronary thrombosis which caused his death. (Two physicians who had treated Berndt for the dermatitis could see no connection between the disease and the coronary thrombosis.) The following hypothetical question was propounded to Dr. Brown:

"Assume a man approximately 59 years of age to whom we will subsequently refer as the hypothetical man. On or about March 1, 1948 the hypothetical man contracted what was diagnosed as contact dermatitis, secondary to plywood glue. He gave up his employment on March 13. He was greatly humiliated and concerned that his wife might believe that he had been untrue to her and contracted a private disease. Both hands, forearms, face, neck, part of his body and his genitalia were affected. He consulted his physician and was otherwise confined to his home and under the care of his wife, who was a graduate nurse. His condition was such that he could only stand to have a sheet over him. The dermatitis was very severe and wet [sweat] profusely; although the wife did not think that there were blisters.

"However, his condition was so difficult that after a few days she felt that she could not stand taking care of him any longer and he went to the hospital, but he only stayed at the hospital a few days and then returned, after which she continued to care for him and to apply bandages and packs.

"In the fall of 1943 the hypothetical man had been operated upon for varicose veins of his left leg below the knee and after the operation was treated for what was diagnosed as eczema over his entire left leg. He was home for seven months. Since that time the hypothetical man had had no sickness or disability of any kind prior to the contracting of dermatitis hereinbefore referred to.

"The hypothetical man continued under the treatment of a local physician for approximately one month more or less,

when he was referred to a specialist in Seattle. This specialist diagnosed his case as dermatitis secondary to glue poisoning and gave the hypothetical man some prescriptions which he continued to use up to the time of his death.

"For a period of about two weeks prior to his death more or less, the hypothetical man complained about his bones aching and his body aching all over, and was very nervous and irritable. And this was quite unlike him ordinarily when he was well.

"He had returned to his work on or about May 3rd and the condition of his dermatitis had greatly improved and pretty well healed up excepting that the condition of his genitals had remained about the same and had shown very little if any improvement.

"On August 6, 1948 he complained especially of the severity of the aching hereinbefore referred to. He returned home from his work shortly after 4:00 p.m. as usual. The hypothetical man had grown pale and lost weight about the same time that he commenced to complain about the aching. He lost his appetite and did not eat as he formerly had. His work also tired him after he went back the last time, which had not been the case before.

"On the said date of August 6th he had dinner with his wife but did not eat very heartily. After dinner and he had looked over the paper for about an hour he told his wife that he was going out to mow the lawn. Sometime thereafter, an hour or possibly an hour and a half later, his wife looked out and saw him lying on the lawn a few feet from the lawn mower. The neighbors came to her assistance and a doctor was called and gave him some shots and decided that the hypothetical man was already dead.

"No autopsy was held but the attending physician diagnosed the cause of death as coronary occlusion. There had been no accident or unusual exertion connected with his work at the mill. And the work itself, although manual, was light and did not call for heavy exertion.

"Doctor, have you an opinion as to the most probable cause of the death of the hypothetical man?"

His answer, in substance, was that the dermatitis did not cause the coronary thrombosis, but that

". . . the main contributing element toward the incidence of an acute coronary thrombosis is the emotional stress and strain involved in this case by the dermatitis which this man had."

As previously stated, the only element of worry or emotional stress, as distinguished from the physical condition caused by the dermatitis, referred to in that question was with reference to the humiliation and concern of the hypothetical man because his wife might believe that he had been untrue to her and had contracted a private disease. Curt Berndt's fear that his wife thought he had such a disease and his worry about it were, of course, subjective matters, dependent upon his wife's testimony. (We pass the question of the sufficiency of hearsay testimony as to purely subjective matters to establish a basis for a hypothesis.)

Dr. Brown apparently attached great importance to this cause of worry. After it had been pointed out that the marked improvement in Berndt's condition made it possible for him to return to work and to remain at work for some three months before his death, and upon being asked if the ordinary individual would not have a feeling of relief at such an improvement in his condition, the doctor replied in language which we have already quoted:

"If he was afraid that his wife thought that he had a social disease, as was stated to me, certainly even though the generalized dermatitis was relieved, the fact that the localized dermatitis remained might have been of considerable emotional import to him. *It is conceivable that that was the most emphatic part of his emotional insecurity*." (Italics ours.)

Omitted from the hypothetical question was the fact that the first time Mr. Berndt had consulted a doctor, accompanied by Mrs. Berndt, they were both advised that the ailment was an irritation of the skin and not a venereal disease.

■ Although hypothetical questions propounded to medical experts need not always include all undisputed facts, any undisputed fact which is material and important in the formulation of a fair, intelligent and sound opinion should be included. *Tugman v. Riverside & Dan River Cotton Mills,* 144 Va. 473, 132 S. E. 179 (1926); *Mathiesen Alkali Works v. Redden,* 177 Md. 560, 10 A. (2d) 699 (1940); *Starr v. Oriole Cafeterias,* 182 Md. 214, 34 A. (2d) 335 (1943).

■ In view of the importance attached by Dr. Brown to the fear by Berndt that his wife thought he had a social

disease, it seems to us that the omission of a patently material and undisputed fact destroyed the probative value of the doctor's opinion.

The supreme court of Utah, in *Nichols v. Oregon Short Line R. Co.,* 25 Utah 240, 245, 70 Pac. 996 (1902), said:

"We think that all these circumstances were very material ingredients of a hypothetical question, the purpose of which was to ascertain from a medical expert the causes which had produced plaintiff's then very serious condition. At the time the question was asked, these facts were all proven, were undisputed, and clearly material. Under such circumstances, a party is not permitted to select facts which may be advantageous to him, and omit proven facts equally material, but not so beneficial to his cause, and upon such partial facts frame a hypothetical question to be submitted to an expert witness. The purpose of all judicial investigation is the ascertainment of truth. Such purpose is wholly frustrated if a party is permitted to exclude from a hypothetical question material undisputed facts.

" 'In a civil case all the undisputed facts of the case must be included in a hypothetical question, both as a matter of sound principle and of reason and justice. Neither party has a right to discard an important undisputed fact because the insertion of such fact may alter or vary the answer or opinion of the witness to the prejudice of such party.' *People v. Vanderhoof,* 71 Mich. 158, 39 N. W. 28; *Levinson v. Sands,* 81 Ill. App. 578; *Davis v. State,* 35 Ind. 496, 9 Am. Rep. 760; *Vosburg v. Putney,* 80 Wis. 523, 50 N. W. 403, 14 L. R. A. 226, 27 Am. St. Rep. 47."

And to the same effect, see *Vosburg v. Putney,* 80 Wis. 523, 529, 50 N. W. 403, 14 L. R. A. 226, 27 Am. St. 47 (1891), where the Wisconsin supreme court said:

"The answer of Dr. Philler to the hypothetical question put to him may have had, probably did have, a controlling influence with the jury, for they found by their verdict that his opinion was correct.

"Surely there can be no rule of evidence which will tolerate a hypothetical question to an expert, calling for his opinion in a matter vital to the case, which excludes from his consideration facts already proved by a witness upon whose testimony such hypothetical question is based, when a consideration of such facts by the expert is absolutely essential

to enable him to form an intelligent opinion concerning such matter."

This is not a situation which the trial court could have remedied by sustaining the objections to the hypothetical question or by striking the testimony elicited by it or by granting a new trial, inasmuch as appeals of department of labor and industries cases to the superior court are tried on the record made before the board of industrial insurance appeals and the question could not be reframed or changed. Had the objections been sustained or the testimony stricken, the result must of necessity have been the dismissal of the case, for without the doctor's testimony there was not even a suggestion of a *prima facie* case.

But apart from a consideration of whether the objections to the hypothetical question should have been sustained or Dr. Brown's testimony stricken, there are further reasons for sustaining the trial court's action in granting judgment notwithstanding the verdict. It is apparent that Dr. Brown took into consideration a cause for worry which was not referred to in the hypothetical question and which had no basis in fact, that relating to economic security. He also added, for which there is no basis in the hypothetical question, a probably previously diseased coronary artery, and assumed that the worries aggravated a pre-existing condition. Both are indicated in an excerpt from his testimony appearing on p. 140, *supra.*

We have recently held that the material facts included in a hypothetical question must be established by the evidence. *Salesky v. Department of Labor & Industries,* 42 Wn. (2d) 483, 255 P. (2d) 896 (1953). It is equally clear that, when an expert who knows nothing about an individual except what is included in a hypothetical question assumes, as the basis for his opinion, the existence of certain conditions not included in that question and not necessarily inferable therefrom, and not established by the evidence, he destroys the validity of his answer. See *Rich v. Philadelphia Abattoir Co.,* 160 Pa. Super. 200, 50 A. (2d) 534 (1947). In that case, the expert assumed the existence of arterioscler-

osis, which was not established by the evidence. In this case, the expert assumes worries about economic security and a diseased coronary artery, neither of which was established by the evidence or included in the hypothetical question.

Dr. Brown, however, was willing to say that in some areas his knowledge of Curt Berndt was limited to the subject matter of the hypothetical question. Asked about the effect of the improvement of Berndt's physical condition on his emotional responses, the doctor answered:

"It depends upon the individual. I couldn't answer that. *It depends upon just how emotional he was.*

*"The only information that I have* is that at the outset of this thing he was markedly and evidently emotionally concerned about the problems that he had. As far as knowing more about him in this hypothetical question, I can't evaluate. I am not able to answer the question which you ask me because I know no more about this man." (Italics ours.)

Whether under the circumstances of this case an expert opinion connecting the dermatitis, through attendant worries (emotional stress and strain), to the coronary thrombosis which occurred five months after the onset of the disease and three months after the condition of the workman had improved so that he could resume his work, can be more than a guess concerning a matter not susceptible of reasonably accurate conclusions, we are not required to determine.

Nor are we prepared to say whether in this particular field (where physiological results are to be connected with emotional causes) a hypothetical question can be framed that will adequately inform an expert who never knew the diseased person in his lifetime, as to how emotional he was; but the difficulty of doing so is well illustrated by the present case, in which the expert had to admit, "I don't know how emotional he was."

We content ourselves with holding (1) that the probative value of the expert's opinion was destroyed by the omission of material and undisputed facts from the hypothetical question; and (2) that an analysis of the testimony of the expert in this case shows that, for the purpose of form-

ing his opinion, he assumed facts and situations not included in the hypothetical question and as to which there was no supporting evidence. The trial court properly concluded that the expert's opinion was based upon speculation, conjecture, and guesswork. The trial court did not, nor do we, attempt to weigh the evidence. There was a failure of evidence in that there was no medical testimony of the character and substance necessary to establish the causal relationship between the dermatitis and the coronary thrombosis, and for that reason the order granting the motion for judgment notwithstanding the verdict was proper and the judgment of dismissal is affirmed.

GRADY, C. J., MALLERY, WEAVER, and OLSON, JJ., concur.

March 30, 1954. Petition for rehearing denied.

