[No. 33451.   Department Two.   April 26, 1956.]

C. W. CLAYTON, *Respondent*, v. THE DEPARTMENT OF LABOR
AND INDUSTRIES, *Appellant*.[1]

[1]Reported in 296 P. (2d) 676.

The *Attorney General* and *Winston C. Ingman, Assistant,* for appellant.

HILL, J.—The issue here presented is the sufficiency of the evidence to support a jury's finding that the extent of the claimant's "permanent partial disability resulting from aggravation of the condition caused by his September 24, 1937, injury between May 15, 1946, and October 4, 1951," was 22.75%. From the judgment entered on that finding of the jury, the department of labor and industries appeals. The claimant, respondent in this court, has filed no brief and made no argument.

There is no merit in the department's contention that the questions asked did not, as required by the Laws of 1951, chapter 115, § 4(b), p. 288 [*cf.* RCW 51.32.080(2)], relate the claimant's unspecified disability, for comparative purposes, to the disability listed in subdivision (a) of that section "which [it] most closely resembles and approximates in degree of disability . . ." Throughout the hearing before the board of industrial insurance appeals and in the trial in the superior court, all parties knew that they were dealing with the consequences of a back injury; that the claimant had already received awards amounting to 52.25% of the maximum for unspecified permanent partial disability; and that what was involved was the determination of the additional percentage, if any, of the maximum for unspecified permanent partial disability to which the claimant was entitled. When in the course of this opinion we refer to the rating of the claimant's permanent partial disability, we, too, are speaking of the percentage of the maximum award for unspecified permanent partial disability.

According to his own testimony, the claimant was employed by the Sauk River Lumber Company from 1923 to April 28, 1952. During much of that period, he worked as a brakeman on the company's logging trains. After the company "quit railroading . . . I went to putting on binders and spotting cars." "Putting on binders" involved climbing a ladder and placing a cable over logs loaded on a car and then crawling under the car and fastening the cable by means of a device called a binder. The claimant worked at this job until the company's logging operations were closed down in October, 1951, and again for eighteen days in April, 1952, when logging was resumed, until a strike was called. He never returned to work thereafter, although the strike ended in June. The claimant testified:

"Q. Had you been working steadily and full time? A. Well, I lost some time last year, last fall [1951]. I was off two weeks or something like two weeks or part of two weeks at different times. Q. What were you off for? A. I wasn't off two weeks at one time, but I lost part of the time on account of my back. I laid off four or five days, I couldn't work. . . .

"Q. From 1946, now, how long did you work for them, from '46 on? A. Well, I worked all the time I was able, up till late October [1951]. I might say last April the 28th [1952]. Q. Work full time? A. No, I have been off some. I lost some time, but I wouldn't turn in my claim or anything. I'd go back to work and they'd help me out and do part of my work and I'd get by pretty good, make a living. Q. What did you do in the woods from 1946 up to April? A. Well, *I was braking till they quit braking, till they quit railroading. Then I went to putting on binders and spotting cars out here at the reload*, right here just above Darrington. Q. Up till April of 1952? A. (Indicates yes) Q. You worked most of the time? A. Well, *yes, most of the time*, I'd say. I lost some time." (Italics ours.)

The company timekeeper, although he had kept records of the hours worked by the claimant since 1946, testified from his own recollection rather than the records:

"Q. Your records, do they indicate the working hours spent by Mr. Clayton on the job? A. Yes, they do. Q. We would like your testimony, then, as to how often Mr. Clayton had layoffs from the job from 1946 to 1951. A. Well, to

my knowledge, without looking at the time sheets, he worked when there was work available. Q. And his layoffs were due to what? A. Due to company shutdown. Q. He worked steady whenever work was available? A. Yes, sir. Q. You mean eight hours a day, five days a week? A. Yes. . . ."

On cross-examination, the timekeeper was asked if he knew, of his own personal knowledge, whether the claimant had "laid off" because of physical disability during the period the witness was timekeeper. He replied, "No, I don't."

There is sharp conflict in the medical testimony as to whether the claimant's increased permanent partial disability, centering in the lower back and right hip and leg, was attributable to the industrial injury of September 24, 1937, or to his increasing age, he being almost sixty-five years old on October 4, 1951, the last terminal date of the aggravation period. This was, however, a jury question. The jury found that some aggravation or worsening of his condition during the five-year period in question was attributable to his industrial injury of September 24, 1937.

Dr. N. C. Riddle, the claimant's attending physician, furnished the medical testimony needed to support that finding. However, he flatly refused to attempt to rate the increase in permanent partial disability due to aggravation. It was, of course, necessary for the claimant to prove the percentage of additional permanent partial disability between the terminal dates. *Moses v. Department of Labor & Industries* (1954), 44 Wn. (2d) 511, 268 P. (2d) 665, and cases therein cited. Medical men are the only ones considered qualified to give an opinion on the amount of disability in terms of percentages. *Wissink v. Department of Labor & Industries* (1952), 40 Wn. (2d) 672, 676, 245 P. (2d) 1006.

Dr. X. P. DeDonato examined the claimant once, on August 1, 1952, some ten months after the last terminal date of the aggravation period. He testified that, as of the date of his examination, the claimant was totally and permanently disabled, and that his condition had become fixed some three or four months before the date of the examination.

He considered comparable X rays taken in 1946 and 1951 and stated that the X rays indicated a worsening of the claimant's condition during the period in question. He conceded, however, that he could not have determined the existence or the extent of disability in either 1946 or 1951 from the X rays apart from the complaints and history given him by the claimant. The history on which Dr. DeDonato relied is found in the following excerpts from his testimony:

"Q. The point Mr. English objected to is the man himself didn't compare his condition in talking to you in 1946 to what it was in 1951. Now, did he, or didn't he? A. Yes, he did. He told me had tried several times to go to work and that his condition progressed and got worse and *he had been unable to hold down any steady job.* Q. Specifically, did he tell you why? A. Yes, on account of the pain and limited motion in his spine. . . . Q. Those were the complaints he made to you, Doctor, and you used the complaints and history to sort of combine? A. Yes, sir. . . .

"Q. Doctor, for the purpose of clarifying it in my own mind, did the claimant tell you that he had worked up to April of 1952? A. April the 28th, 1952, I think is correct. However, *he worked sporadically, periodically, and light work, that is what he told me.* Q. Did he tell you why he quit work in April of 1952? A. Because he was unable to carry on, his story is the pain was aggravated in his spine, couldn't even walk comfortably and any little lifting made it unbearable in his spine and his right leg." (Italics ours.)

Dr. DeDonato testified that the claimant's increased disability during the aggravation period, in terms of percentages, was 50%. Without his testimony there would be no support for the jury's finding of an additional 22.75% of permanent partial disability suffered between May 15, 1946, and October 4, 1951.

However, his testimony does support the jury's finding as to the percentage of increase if there was sufficient basis for that opinion to give it probative value. The issue, then, becomes whether the falsity of the history of inability to hold a steady job and of only sporadic, periodic, and light work destroys the probative value of the doctor's rating or is merely a factor affecting the weight to be given his testimony.

Certain of our recent decisions, relied upon by the department, are readily distinguishable. In *Cyr v. Department of Labor & Industries* (1955), 47 Wn. (2d) 92, 286 P. (2d) 1038; *Parr v. Department of Labor & Industries* (1955), 46 Wn. (2d) 144, 278 P. (2d) 666; and *Berndt v. Department of Labor & Industries* (1954), 44 Wn. (2d) 138, 265 P. (2d) 1037, the issue on which the testimony of the claimant's expert was found to have no probative value was the causal relationship between the disability or death of the workman and his employment.

It is apparent that the doctor's opinion on such an issue must depend, in practically every case, either upon what he is told by the workman or upon what he is asked, in a hypothetical question, to assume the facts to be. The information given him must be complete (nothing material omitted) and accurate or his opinion is valueless (the *Parr* case, *supra*). If his opinion is based upon a hypothetical question and he assumes the existence of material conditions not established by the evidence or not included in the question or inferable therefrom, he destroys the validity of his answer (the *Cyr* and *Berndt* cases, *supra*). It was likewise on the issue of causal relationship that we found Dr. DeDonato's testimony to be without probative value in *Kirkpatrick v. Department of Labor & Industries* (1955), *ante* p. 51, 290 P. (2d) 979.

█ In the present case, the testimony of Dr. Riddle, the claimant's attending physician, was sufficient to take the case to the jury on the issue of causal relationship between the disability and the industrial injury, and was also sufficient to take the case to the jury on the issue of whether there had been some aggravation of the disability between May 15, 1946, and October 4, 1951. Under these circumstances, we are concerned only with the probative value of Dr. DeDonato's testimony as to his rating of the claimant's increased permanent partial disability during the aggravation period.

█ Dr. DeDonato was not forced to rely entirely upon what was told him by the claimant. He examined the claimant August 1, 1952, and made objective findings; he saw

the comparable X rays taken in 1946 and 1951, which furnished some corroboration of the claimant's complaints of a worsening of his condition during that period. We hold that there was probative value in Dr. DeDonato's testimony and that its weight was for the jury.

The jury obviously was unwilling to accept Dr. DeDonato's testimony of an additional 50% of unspecified permanent partial disability during that period. The claimant's prior awards (52.25%), with Dr. DeDonato's additional percentage, would have made a total award of 102.25% of the maximum for unspecified permanent partial disability resulting from the injury incurred September 24, 1937; and this for a man who, during the entire period in question, worked as a brakeman on a logging railroad or "spotting" cars at the reload point and putting binders on carloads of logs, the latter employment extending beyond the last terminal date of the aggravation period.

The jury apparently concluded that the claimant was suffering a total of 75% unspecified permanent partial disability, as it found that there had been an additional 22.75% of permanent partial disability during the aggravation period.

We have heretofore upheld a jury finding of 25% of unspecified permanent partial disability where the only testimony supporting the verdict was 50%. *White v. Department of Labor & Industries* (1956), *ante* p. 413, 293 P. (2d) 764.

If a total award of 75% of the maximum for unspecified permanent partial disability seems high under the circumstances, it should be remembered that we are not considering an award for permanent total disability but for permanent partial disability, and that the maximum for unspecified permanent partial disability is not equivalent to a permanent total disability award. *Franks v. Department of Labor & Industries* (1950), 35 Wn. (2d) 763, 776, 215 P. (2d) 416. In the *Franks* case we pointed out that

" . . . a person may receive an award totaling the maximum of unspecified permanent partial disability, even

though such person is capable of engaging in some form of gainful employment."

We cannot say that the jury did not properly evaluate Dr. DeDonato's rating in the light of all the testimony. The trial court did not err in failing to grant a judgment notwithstanding the verdict.

The department seeks, in the alternative, a new trial, this request being based primarily upon erroneous instructions. Instruction No. 10 is conceded to be erroneous, but in our opinion it was not prejudicial. In instructions Nos. 7, 12, and 18, the trial court seems to have assumed that total permanent disability was one of the issues to be submitted to the jury. To the extent that they deal with or suggest the existence of total permanent disability, these instructions are erroneous; but in the light of the verdict it would not appear that they were prejudicially erroneous.

The trial court did not err in refusing to grant a new trial.

The judgment is affirmed.

HAMLEY, C. J., DONWORTH, WEAVER, and ROSELLINI, JJ., concur.

