HULSIZER *v.* JOHNSON-BRENNAN CONSTRUCTION CO.

5-2178                                          339 S. W. 2d 116

Opinion delivered October 17, 1960.

*Little & Enfield*, for appellant.

*Pearson & Pearson*, for appellee.

ED. F. McFADDIN, Associate Justice. This is a Workmen's Compensation case. Mrs. Alta Hulsizer filed

claim because of the death of her husband, Ivan Hulsizer, who suffered an attack and died while employed by Johnson-Brennan Construction Company at Rogers, Arkansas. The Referee allowed the claim; the Full Commission, reversing the Referee, disallowed the claim; the Circuit Court affirmed the Full Commission; and Mrs. Hulsizer appeals to this Court. Appellant recognizes the long established rule that if there be substantial competent evidence to support the finding of the Full Commission, then we will affirm such finding.

The appellant points out, however, that the Full Commission reversed the Referee and decided the case against Mrs. Hulsizer because of the testimony of Dr. Riggall; and the appellant urges that Dr. Riggall's testimony was not competent evidence because, in answering a hypothetical question, he assumed facts not contained in the question or otherwise shown in the record. We reach the conclusion that the appellant is correct and the Circuit Court judgment must be reversed.

In allowing the claim the Referee delivered a written opinion from which we copy pertinent excerpts:

"The deceased, Ivan Hulsizer, was 51 years of age on the morning of September 27, 1957, and reported to work at his usual hour of 7:30 A.M. at Rogers, Arkansas. He was employed as a common laborer for said construction company and had been employed by it for a period of two years prior to the date of his death . . . On the morning of September 27, 1957, the deceased commenced his work at 7:30 A.M. and continued his work until approximately 8:15 A.M., when he collapsed at work and was taken by ambulance to the Rogers Memorial Hospital in Rogers, Arkansas where he expired a few minutes after arrival in the emergency room of said hospital. An autopsy was performed on the body of the deceased and a finding was made by Dr. Grier Warren that the deceased had died from a cerebral hemorrhage . . . On the morning of September 27, 1957, the deceased, along with co-workers, was carrying and stack-

ing wet or damp lumber that had been used in the laying of concrete floors and foundations. These pieces of lumber carried individually by the workers weighed from sixty to seventy pounds and were picked up from the floor and carried approximately twelve to sixteen feet where they were stacked. The deceased was in the process of carrying one of these pieces of lumber when he collapsed on the job. The death certificate, along with the autopsy report and various medical reports, was introduced and made a part of the record in this claim. This evidence, together with the testimony of Dr. John Rollow, Dr. Grier Warren, Dr. Neal Compton, Dr. Stewart Wilson, and Dr. D. H. Butler, together with the claimant's widow and two lay witnesses, was presented for the benefit of the Referee in this claim . . .

''A great deal of time and effort have been devoted to reading and studying all of the testimony and evidence introduced and made a part of the record in this claim. The Referee is of the opinion that two decisions of the Arkansas Workmen's Compensation Commission and of the Supreme Court of the State of Arkansas are determining factors in the decision of this claim. In the well known case of *Bryant Stave Company* v. *White,* 227 Ark. 147, 296 S. W. 2d 436, the Supreme Court defined the term 'accidental injury' to cover the condition of the deceased in this claim. In the later case of *E. P. Bettendorf & Co.* v. *Kelly,* 229 Ark. 672, 317 S. W. 2d 708, the Court went further in making a determination of what is an accidental injury arising out of and in the course of employment.

''A study of the evidence in this claim, taken together with the medical testimony, shows, in the opinion of the Referee, that the worker had a pre-existing condition which taken together with the work load that the deceased was undertaking on September 27, 1957, and the resulting death were all related to his work and that his work was the causal connection in his death. The medical evidence shows that if the claimant did have a pre-existing condition it was a weakening of one of the ves-

sels near the brain which weakness was ruptured by the heavy work and stress and strain that were placed upon the workman on the date of his death causing his instant death.''

The cases cited by the Referee clearly sustained his conclusions. The facts here are strikingly similar to those in *Bettendorf* v. *Kelly,* 229 Ark. 672, 317 S. W. 2d 708, wherein we reaffirmed our unanimous holding in *Bryant Stave Co.* v. *White,* 227 Ark. 147, 296 S. W. 2d 438, and also said:

''Every time a mortal is born everyone knows that some time the mortal will die, so the death of a mortal is never unforeseen or unexpected in the light of human existence. But just when the death will occur and under what circumstances, is certainly unforeseeable and unpredictable. So it was with the heart attack of Mr. Kelly in the case at bar: no one could tell when it would occur. He was engaged in a line of work, he was exerting himself by the driving of nails into the pallets, he collapsed: his death was, therefore, accidental and within the scope of his employment.''

One of the witnesses who testified before the Referee was Dr. Grier Warren, who made the autopsy of Ivan Hulsizer; and the portion of that report germane to the issue here is as follows:

''BRAIN: The skull was opened and there was evidence of intra-cranial bleeding throughout. There was no evidence of fracture as noted on the entire surface of the skull which was smooth. Blood covered the whole area of the brain and extended down into the spinal column. *The blood vessels could not be traced out due to the amount of blood and hematomas on the upper surfaces. No areas of hemorrhage or softening are noted on the cut surfaces of the brain.*

''GROSS PATHOLOGY: Specimen of brain revealed evidence of intra-cranial bleeding with large hematomas over entire surface of specimen. *Entire brain*

*was examined. No evidence of hemorrhage or softening within the brain tissue was noted.*

"DIAGNOSIS: Cerebral Hemorrhage." (Emphasis supplied.)

When the case was heard before the Full Commission the transcribed testimony, heard before the Referee, was presented and the only other additional witness was Dr. Riggall, who testified as an expert as to the cause of Ivan Hulsizer's death. There is no claim that Dr. Riggall ever saw Ivan Hulsizer, alive or dead. The doctor stated that he had read a transcript of the testimony before the Referee and was then asked a hypothetical question as to the cause of Ivan Hulsizer's death. The hypothetical question incorporated in it the autopsy report about the brain of Hulsizer:

"And upon opening the cranium free blood covered the whole area of the brain and it was found throughout the cavity extending down into the spinal column. *No ruptured vessels could be demonstrated and no areas indicative of previous trauma* to the head were found and that death resulted from shock due to cerebral hemorrhage." (Emphasis supplied.)

The hypothetical question ended:

"From the foregoing assumed facts, do you have an opinion to a reasonable medical certainty whether the work caused or contributed to the cause of the death of the hypothetical Ivan Hulsizer?"

Dr. Riggall giving an answer covering three typewritten pages concluded that Hulsizer died because of a congenital pathological defect known as a congenital aneurysm. In so concluding the doctor said:

"I find it easy to reconstruct the picture and I am certain from those facts that death occurred from the *rupture of a congenital aneurysm of one of the internal carotid vessels and this was not found by the maker of the post mortem,* because it is on the floor of the brain and could not be seen unless the brain had been removed

and that is the usual method of showing this lesion. (Emphasis supplied.)

Promptly the attorney for Mrs. Hulsizer objected, saying:

"I object and ask that the entire answer be stricken from the record for the specific reason that the autopsy report and report of the autopsy surgeon does not show such defect. He is assuming such defect to be there and that the autopsy surgeon did not do a proper job of autopsy and is presupposing facts without the record and the whole response should be stricken from the record." The Commission allowed the doctor's answer to remain; and therein we consider reversible error to have occurred. It is readily apparent when the autopsy report is compared with Dr. Riggall's answer — as we have emphasized the portions — that he assumed a fact contrary to the autopsy report: *i.e.*, that a blood vessel had ruptured in a portion of the brain not discovered by the doctor making the autopsy. On this assumption — contrary to the autopsy report — Dr. Riggall predicated his conclusion. Dr. Riggall's testimony must be discarded as stating something to be a fact that was not shown on the autopsy report. Dr. Riggall's entire testimony is bottomed on his position that because of his medical experience he knew more about the brain than did the physician who made the autopsy report and that certain facts had to be true as regards the autopsy even though such facts were not shown. Superior knowledge is a wonderful attribute; but an expert in answering a hypothetical question must base the answer on admitted facts and cannot assume facts contrary to or in addition to the admitted facts. That is the vice of Dr. Riggall's testimony.

There are two sources from which an expert can gain facts in a case like this. One is from a personal examination, and the other is the factual statement in the hypothetical question. As previously stated, Dr. Riggall never saw Ivan Hulsizer, alive or dead: so Dr. Riggall's only source from which he could gain facts on which to

testify must be the facts stated in the hypothetical question. As the Supreme Court of Washington stated in *Clayton* v. *Dept. of Labor,* 48 Wash. 2d 754, 296 P. 2d 676:

"If his opinion is based upon a hypothetical question and he assumes the existence of material conditions not established by the evidence or not included in the question or inferable therefrom, he destroys the validity of his answer . . ."

The same Court in *Berndt* v. *Dept. of Labor,* 44 Wash. 2d 138, 265 P. 2d 1037, said:

"It is equally clear that, when an expert who knowns nothing about an individual except what is included in a hypothetical question assumes the existence of certain conditions not included in that question and not necessarily inferable therefrom, he destroys the validity of his answer. See *Rich* v. *Philadelphia Abattoir Co.,* 1947, 160 Pa. Super. 200, 50 A. 2d 534. In that case the expert assumed the existence of arteriosclerosis, which was not established by the evidence. In this case, the expert assumes worries about economic security and a diseased coronary artery, neither of which was established by the evidence or included in the hypothetical question."

In *Atlantic Coast Line R. Co.* v. *Shouse,* 83 Fla. 156, 91 So. 90, the Supreme Court of Florida said:

"The answer of an expert witness to a hypothetical question must be given upon the basis of the facts stated in the question, and without recourse to other facts within his own knowledge. See *Fuller* v. *City of Jackson,* 92 Mich. 197, 52 N. W. 1075; *City of Wichita* v. *Coggshall,* 3 Kan. App. 540, 43 Pac. 842; *Link* v. *Sheldon,* 136 N. Y. 1, 32 N. E. 696; *Burns' Ex'r.* v. *Barenfield,* 84 Ind. 43. But the witness in this case not only declined to answer the question upon the basis of the facts stated, but had recourse, not to facts within his own knowledge, but to an imaginary case of his own construction, built in part from some of the facts embraced in the question, his deductions from conflicting evidence referred to in

the question, and in part from his imagination, and a case which had no basis whatever in the record.''

Other courts have recognized the same rule. See *Fidelity & Cas. Co.* v. *Van Arsdale*, Tex. Civ. App., 108 S. W. 2d 550; *Mounsey* v. *Bower*, 78 Ind. App. 647, 136 N. E. 41 and *Ballance* v. *Dunnington*, 241 Mich. 383, 217 N. W. 329, 57 A. L. R. 262. See also Rogers on ''Expert Testimony'', 3rd Ed. § 54; and 32 C. J. S. 366 *et seq.*, ''Evidence'', § 557 *et seq.*

The Commission committed error in allowing Dr. Riggall's answer as competent. Therefore, the judgment of the Circuit Court affirming the Commission is reversed and the cause is remanded to the Circuit Court with directions to reverse the Commission's award and remand the cause to the Commission for further proceedings in accordance with this opinion.

GEORGE ROSE SMITH and ROBINSON, JJ., dissent.

GEORGE ROSE SMITH, J., dissenting. I agree that the opinion of an expert witness cannot properly be based upon a set of hypothetical facts for which there is no proof in the record. For instance, in *Payne* v. *Thurston*, 148 Ark. 456, 230 S. W. 561, a medical witness was asked a hypothetical question which included an assumption that the plaintiff had suffered an injury to her left side. There was actually no evidence of such an injury. It was correctly held that the question was defective, for neither the jury nor the court could possibly determine the extent to which the witness's opinion was based upon the fact that was assumed but not proved.

That is not the situation in the case at bar. Here the physician performing the autopsy concluded that the cause of death was cerebral hemorrhage, but he did not attempt to specify the exact spot at which the hemorrhage occurred. On this point he merely reported that the entire brain was examined and that no evidence of hemorrhage within the brain was noted.

Dr. Riggall simply attempted by a process of reasoning to determine the situs of the hemorrhage. He stated

that within the cranium there are only three arteries of sufficient size to produce a hemorrhage such as that disclosed by the autopsy. Two of these arteries are so situated that the jet of blood from a fatal hemorrhage would plow a channel within the brain tissue so large that it could not be missed at the post mortem examination. But, reasoned Dr. Riggall, if the rupture occurred in the third artery—the internal carotid artery—it would account for the condition actually found and yet might not be observed by the maker of the post mortem, as the rupture would be on the floor of the brain and not readily discernible. From this conclusion Dr. Riggall went on to give his basis for thinking that the decedent's work would not have contributed to a hemorrhage within the internal carotid **artery.**

I think the majority are misapplying the rule which precludes an expert witness from basing his opinion upon a fact not in evidence. If, for instance, this autopsy had contained a positive finding that the hemorrhage took place in one of the two arteries first mentioned **by Dr.** Riggall, then of course he could not have based his opinion upon an assumption that the damage happened within the internal carotid artery. In that situation the rule **in** question would be properly applied.

But this is not the case at hand. The autopsy actually contained an affirmative finding of a cerebral hemorrhage, and by definition such a hemorrhage must occur within the brain. But the author of the post mortem report did not attempt to say just where within the brain the hemorrhage took place; he merely stated that no evidence of the hemorrhage within the brain was noted. All that Dr. Riggall did was to attempt by a chain of logic to demonstrate where the hemorrhage probably occurred. His opinion was of course open to contradiction by other testimony and to rejection for want of persuasiveness, but it was clearly admissible. Otherwise we are driven to the patently untenable position that is being adopted by the majority. That position boils down to this: (1) If the autopsy report affirmatively shows the situs of the hem-

orrhage that fact cannot be disputed by expert opinion, for that would contradict the report. But (2) if the autopsy report fails to show the situs of the hemorrhage the missing fact cannot be supplied by expert opinion, for that too would contradict the report. Thus it makes no difference whether or not the post mortem examiner makes a finding of the cause of death, for in either case his report constitutes the final word. I cannot agree with such questionable logic and therefore dissent.

ROBINSON, J., joins in this dissent.