Rhea v. M-K Grocer Co.

5-3004
370 S. W. 2d 33

Opinion delivered May 20, 1963.

[Rehearing denied September 16, 1963.]

*J. Kenton Cochran,* for appellant.

*Wright, Lindsey, Jennings, Lester & Shults,* for appellee.

Carleton Harris, Chief Justice. This is a Workmen's Compensation case. Virginia K. Rhea, for herself and children, filed a claim which arose out of the death of her husband, Boyce Rhea, who died from a brain hemorrhage on February 1, 1960, on which date he was admittedly employed by M-K Grocer Co., Inc. Appellants contend that Mr. Rhea sustained an accidental injury, arising out of and in the course of his employment, and that they are entitled to compensation. The referee found that the brain hemorrhage which Rhea suffered, and which resulted in his death, did not arise out of and in the course of his employment. The full commission sustained this finding, and, on appeal to the Circuit Court, the commis-

sion was affirmed. From the judgment so entered, appellants bring this appeal.

According to the testimony of Clyde Pearson, a fellow worker, Rhea started to work at 7:00 A.M. on the date in question (February 1, 1960), working as a shipping clerk, and after helping load a truck, assisted three or four men in pushing a box car to the proper place for loading, a distance of three or four feet. Before moving this car, it was necessary to push another loaded box car out of the way for the same distance. This was moved by using a pinch bar, and with all parties pushing. Moving the box cars was an unusual duty for Rhea. Pearson was unable to state the time this work took place other than it occurred between 9:00 and 12:00 A.M. He testified that Rhea went to lunch at 12:00 o'clock, and returned from lunch "right at 1:00 o'clock." From the testimony:

"I was sitting in the office. He came through. He generally stopped and talked but he come on through to the back of the store and got him a cup of water and sat down on the floor and I got up and followed him out and when I got out there, why he was setting weaving and I asked him what was wrong and he said he had a severe headache and I asked him if I could do something and he didn't answer me then and then he said 'Somebody has got to do something' and I said 'I'll call an ambulance' and run in the office and told Charles to call an ambulance that something was wrong and I run back out there and Kyle, Hugh and I just lay him on down because he was about to fall."

The witness stated that Rhea was unconscious and he could hear a "gurgle in his throat." The ambulance arrived in about 10 minutes, and Rhea was taken to the hospital.

Leonard Crain, another fellow employee, testified that Rhea came to work on the morning in question prior to 7:00 o'clock, and he verified Pearson's testimony to the effect that Rhea had helped in pushing the box cars. He stated that subsequently Rhea was engaged in "stacking cans" in the warehouse, which required the latter to

pick up cases weighing approximately 40 pounds each, and stacking same above his head. This work, according to the witness, lasted for two or two and one-half hours. Crain said that around 11:00 o'clock, Rhea told the workers "that he had a bad headache, says 'I don't believe I have ever had the headache any worse' and so that was all that was said, and he went back down and stayed downstairs then until noon." Crain further testified that the workers ceased work at 12:00, upon directions from Rhea who "a few minutes before 12:00, between 11:30 and 12:00" had told the employees "to come on down pretty soon that it was time to go." The witness stated that Rhea returned from lunch about 20 minutes until 1:00 o'clock, and suffered the attack 5 or 10 minutes later.

Dr. J. A. Henry, a physician of Russellville, testified that he became acquainted with Rhea in 1952, and performed an operation on the latter at that time for a ruptured liver. He attended Rhea after the attack on February 1. Dr. Henry stated that Rhea suffered a cerebral hemorrhage, and the medical history revealed that the deceased had pre-existing arteriosclerosis. Following Rhea's death, an autopsy was performed. From the testimony:

"It was our opinion that there had been an aneurysm in this region which had ruptured and produced the hemorrhage. This could have been a congenital aneurysm. It could have been an aneurysm due to arterial disease, arteriosclerosis because pathological examination of other arteries in this region revealed evidence of arteriosclerosis."

When asked what would hasten the rupture of an aneurysm,[1] Dr. Henry replied,

---

[1] According to Dr. Henry, this is the medical descriptive term for the weakening of the wall of an artery. "These aneurysms are of different etiology or cause, caused by different things. First, you can have a congenital aneurysm and by that I mean that the individual is born with a weakness in the wall of the blood vessel and this weakened area becomes ballooned out as would a weak place on an inner tube and then with the stress and the strain of life, the increase in the pressure in the blood vessel, the aneurysm ruptures. These are usually called a Berry aneurysm because when you look at them in the unruptured state they look like a little berry, a little red, say, raspberry. You also get aneurysms in arteries which are due to degenerative disease of the wall of

"Anything that an individual with an aneurysm might do that would tend to increase the pressure of the blood within that diseased artery could naturally tend to cause it to rupture and the things that might increase one's blood pressure would be physical exertion, could be mental strain, certain positions that the body might be placed in that could increase pressure within and say if the aneurysm were in the brain, increase the stress there, the pressure within the blood vessel.

"I want to add that these aneurysms can rupture while at rest. There can be enough stress and strain placed on this weakened place that eventually it just ruptures at some time when even the patient might be asleep but I think that it is without question that any extra stress that would be placed on this blood vessel, particularly anything that would increase the pressure within it such as elevation of the blood pressure would be more apt to cause it to rupture quicker than it would if the stress were not placed upon it."

In response to a hypothetical question, based upon the work that Rhea had been performing, the doctor stated,

"I would think that severe excessive physical exertion would at the time that this exertion was being performed would raise his blood pressure and this man had had a pre-existing moderate elevation of his blood pressure."

The doctor concluded that the exertion by Rhea at his work contributed to the fatal hemorrhage, and he was definitely of the opinion that the rupture would not have occurred as quickly if the work activities had not been engaged in. On cross-examination, Dr. Henry testified that the increased pressure (caused by the work) could have caused the rupture either during the period of exertion or later.

---

the blood vessel. Most of these are due to arteriosclerosis which weakens the wall of the blood vessel or due to atherosclerosis of the lining of the blood vessel which weakens it and allows blood to escape in to the wall of the blood vessel and weaken it. * * * It is possible to get an aneurysm due to traumatic injuries such as a gun shot wound or a knife wound which partially severs the wall of a blood vessel and weakens it so that it subsequently dilates in the region of the injury."

Dr. Robert Watson, neurosurgeon of Little Rock, testified in behalf of appellees by deposition on August 25th. The doctor stated that he had read the transcript in detail, consisting of testimony taken on May 26, and on July 24. He was likewise of the opinion that the cause of Rhea's death was a massive cerebral hemorrhage at the base of the brain, as described by the autopsy report. He was then asked the following question by counsel for appellees:

"Q. From the record that you have reviewed and your study of it, what is your opinion as to whether or not the work described in the record which Mr. Rhea did on the day of his death caused or was a causative factor in his death on that date?"

This question was objected to by counsel for appellants, who stated,

"I think you are going to have to detail out the exact facts on which you are questioning him. I think that is a broadside question just asking him of facts based on the entire record. I think he needs to detail it out and make it definite and certain."

The objection was overruled, and Dr. Watson replied as follows:

"I reviewed the record pertaining to what different witnesses said in respect to the work that was done, the type of work, the time element particularly was considered, that the man went on to a supposedly normal lunch hour and returned back to work in a rather normal fashion and then abruptly showed evidences of being in severe difficulties and, based on the information that I gained from reviewing the record, I do not feel that the work that he did was a major factor in the abruptness of his death after the lunch hour."

Further, from the testimony:

"Q. With regard to the time of his death which occurred about one o'clock, can you give us your opinion as to the time he sustained the cerebral hemorrhage?

"A. In view of those factors that I have just enumerated, I feel that the time element between the hemorrhage and the onset of symptoms and also the onset of death was certainly a brief time and by "brief" I mean a matter of minutes."[2]

Dr. Watson then stated that it is very common for people to suffer a brain hemorrhage while simply talking to someone, and "these hemorrhages are common occurring while they are watching TV or while they are driving a car or even in their sleep."

From the record:

"Q. Now in your opinion—I am rephrasing it again. Did the work that this man was doing on the morning of February 1st as reflected by the transcript in this case cause or directly cause the hemorrhage which occurred to his brain according to the record again about one o'clock p.m.?

"A. I reviewed the record as I say and from what information I have, the work did not cause the hemorrhage occurring around one p.m."

The doctor was also of the view that Rhea's work did not contribute in any manner to the hemorrhage. He said, "It is most unlikely and certainly highly speculative and I do not know how one would prove that the work that he did that morning would contribute to his accident."

We are of the opinion that the judgment must be reversed, and the cause remanded to the commission. This conclusion is predicated on the fact that additional evidence was offered by the claimant on September 7, which was not available to Dr. Watson at the time he gave his opinion. This additional information consisted of "bedside notes," "personal history and physical examination," and an affidavit by E. B. Dodson. That affidavit is as follows:

---

2 Dr. Watson explained that under the overall term "hemorrhage of the brain," a person could, in theory, have survived for "maybe days and weeks," but, bearing in mind the nature of the hemorrhage and the location, this could not have been true in Rhea's case, i.e., he did not suffer the hemorrhage at 11:00 A.M. Actually, Rhea did survive for three hours, but was unconscious during the entire period of time.

"I am an employee of Shinn Funeral Home, Russellville, Ark., and was so employed on February 1, 1960. I was present in the office of Shinn Funeral Home on February 1, 1960, when the emergency call came in for an ambulance to pick up Boyce Rhea, deceased, at the M. K. Grocery Co., Inc., here in Russellville.

"When this call came in to the Funeral Home, it was answered by Mr. Avery Shinn. I looked at my watch as Mr. Shinn was taking the call, and at that time it was twelve minutes past twelve o'clock noon (12:12 p.m.), February 1, 1960.

"I accompanied Mr. Shinn with the ambulance to pick Mr. Rhea up. He was unconscious when we arrived at M. K. Gro. Co. Mr. Shinn and I delivered Mr. Rhea to the emergency room at St. Mary's Hospital, Russellville, Arkansas, at approximately 12:22 p.m. or 12:23 p.m. I was present when Dr. Arnold Henry examined Mr. Rhea, and took his blood pressure, which was approximately 12:30 p.m. on February 1, 1960."

It will be recalled that Pearson testified that Rhea returned from lunch "right at 1:00 o'clock," and suffered the attack shortly thereafter. Crain testified that Rhea returned from lunch about 12:40, and suffered the attack five or ten minutes later. Dodson's affidavit indicates that the attack occurred about 12:10, so that there is a variance of nearly an hour between the testimony of Pearson and the affidavit by Dodson. It will be noted that Dr. Watson, in giving his opinion, emphasized the time element, as he said, "The time element particularly was considered, that the man went on to a supposedly normal lunch hour and returned back to work in a rather normal fashion and then abruptly showed evidences of being in severe difficulties, * * * ." Appellees argue that the facts mentioned are immaterial, since Dr. Watson was of the opinion that death, or complete inability to continue work, would have occurred within a few minutes.[3] We do

[3] Dr. Watson testified that the increased blood pressure caused by the strain of lifting cases should have receded to normal limits within a matter of from five to ten minutes after the exertion, and he stated, "whether or not it would remain high for three hours is just medically speculative, most remote and I don't know of any experimentation that ever substantiates blood pressure staying up after three hours after a transient exertion."

not agree. Inasmuch as the referee's finding was based almost entirely on the testimony of Dr. Watson, we feel that the facts should be clearly ascertained. The doctor considered that Rhea took a "normal lunch hour." This term needs clarification. What is meant by a normal lunch hour? Does this have reference to the fact that Rhea left for lunch at his regular time? Does it mean that he was apparently feeling as well as usual, or that he partook of an average meal? Does the quoted statement have reference to the amount of time spent away from work during the noon period? Under common usage, a normal "lunch hour" is probably considered as one hour, as denoted by the term itself. Pearson testified that Rhea went to lunch at 12:00 o'clock, and returned at 1:00 P.M., and yet Dodson's statement, *which was not in the record at the time Dr. Watson read same,* relates that the call for the ambulance occurred at 12 minutes after 12:00. Since Dodson made a record of the time, it would appear that his statement was correct. Under the testimony of either fellow worker, Rhea could not have gone to lunch before 11:30. On the other hand, if Pearson was an hour "off" on the time that Rhea went to, and returned from, lunch, Rhea would have left the plant at about the time of the severe headache complained of at 11:00 A.M. Certainly, it would seem that this point could be more clearly developed. It may be that Dr. Watson's opinion (as to whether the work contributed to the injury) will remain unchanged, irrespective of whether Rhea went to lunch at 11:00 A.M., 11:30 A.M., or 12:00 noon, and it may be considered inconsequential as to whether he remained off during the lunch period for 10 minutes, or an hour—but, as stated, inasmuch as the denial of compensation was based upon the doctor's evidence, we feel that these matters are deserving of clarification. This is particularly true since the conflict in evidence is closely related to the objection appellants made (the fact that Watson's opinion was not elicited by a hypothetical question).

Appellants vigorously argue that the referee and commission committed error in permitting the doctor to give his opinion simply by reviewing the entire record,

rather than requiring appellee's counsel to obtain the doctor's opinion through a hypothetical question embracing pertinent facts, since under the latter procedure, the commission and parties would clearly have known the basis for the doctor's opinion. Appellees defend the method used, and both sides cite several tort cases in support of their positions. Cases cited by appellees deal with situations wherein doctors listened to testimony in the court room and were then permitted to express their opinions. This question is just now arising in compensation cases, and we think a definite rule should be fixed. It is, we think, noteworthy, that in a majority of the cited cases where the practice was permitted, the doctor's opinion was given after listening to the testimony of, or being interrogated about the findings of, only one witness. This is in line with the views of most of the authorities examined. In McCormick on Evidence, Chapter 3, Section 14, Page 30, we find:

"In many jurisdictions, it seems customary to have the expert witnesses in court during the taking of testimony, and then when the expert is himself called as a witness, simplify the hypothetical question by asking the expert to assume the truth of the previous testimony, or some specified part of it. This practice has some advantages, and some limitations. Two obvious requirements are that the facts that the witness is assuming must be clear to the jury, and that the data assumed must not be conflicting. A question which asked the witness to assume the truth of one previous witness' testimony will usually meet these requirements, but as the range of assumption is widened to cover the testimony of several witnesses, or all the testimony for one side the risk of infraction is increased, and when it covers all the testimony in the case, the question would manifestly be approved only when the testimony on the issue is not conflicting and is brief and simple enough for the jury to recall its outlines without having them recited."

In 32 C. J. S., Section 554, Pages 362 and 363, appears the following:

"A desire to economize time has led a number of courts to sanction the practice, in cases where the facts

are undisputed, of dispensing with a recital of facts in a hypothetical question and asking the witness to state his judgment "upon the evidence," or even on such a part of it as is material to the inquiry, although it is conceded to be the better practice to proceed in the regular manner and frame a hypothetical question, one objection to the question on the evidence being that the witness may not be able to remember all the testimony, and to allow him to proceed on what he chances to recollect deprives the parties of any knowledge as to the real basis of his inference. The witness must, of course, have heard the evidence, or be familiar with it, and the question must require him to assume that it is true. * * *

"In some jurisdictions the practice of allowing an expert witness to ascertain the facts directly from the evidence, instead of their being embodied in a hypothetical question, has been condemned and generally disallowed, and even where the practice is allowed it is subject to limitation, and even to curtailment, in the discretion of the court. A question "upon the evidence" should never be permitted where the facts are in dispute, and the testimony is voluminous and complicated, for the reason that such a practice necessarily involves an invasion of the province of the jury, whereas the function of the witness is not to decide on the facts but to assume their truth, and for the further reason that, as the answer of the witness would disclose nothing as to his view of the facts, it would be impossible to tell what facts were used by him in forming his judgment."

In *Arkansas Baking Company* v. *Wyman*, 185 Ark. 310, 47 S. W. 2d 45, we stated that the better practice in obtaining the opinion of an expert witness is by the use of the hypothetical question.

In *Holstein* v. *Quality Excelsior Coal Co.*, 230 Ark. 758, 324 S. W. 2d 529 (compensation case), a doctor gave an opinion based upon a study of the autopsy report and a hospital record. We approved this on the basis of the fact that the autopsy report is a statement of facts rather than an expression of an opinion, and we also approved the use of the patient's clinical history and hospital re-

ports, stating, ''These documents were undoubtedly admissible under the statutes that govern in compensation cases, Ark. Stats. 1947, §§ 81-1323 and 81-1327; * * * .''

The reasonableness of requiring expert opinions in compensation cases to be given in response to hypothetical questions can hardly be disputed. In the first place, these cases frequently involve several hearings, and sometimes extend over a period of months. Furthermore, there is often considerable testimony, much of it at variance. It is somewhat doubtful that an expert, while testifying, could keep all of the facts clearly in his mind; certainly, he will give preference to some facts over others, as being more important or pertinent to the issue. The commission, as well as the attorneys, are entitled to know the basis of the expert's opinion. If a doctor is permitted to simply read the entire record, and thereafter give his opinion, based upon that record,[4] without stating the particular testimony, or facts, upon which the opinion is based, he actually becomes a *trier of the facts,* and thus usurps the function of the commission.

In *Hulsizer* v. *Johnson-Brennan Construction Co.,* 232 Ark. 571, 339 S. W. 2d 116, we reversed the finding of the commission, holding that a medical expert, in answering a hypothetical question, assumed a fact not in evidence. In the case before us, it is established that Dr. Watson's views were expressed after reading a record that *did not contain all of the possibly pertinent evidence;* ''established,'' we say, because the evidence had not even been introduced at the time he gave his opinion. This is certainly *not* to say that opinions of doctors should never be obtained until all evidence has been introduced; nine times out of ten the instant situation would not arise, since it is assumed that the commission considers all evidence in reaching its determination. However, where it is not known what testimony the expert relied upon, and part of the testimony is clearly in conflict with later evidence offered, and appears relevant (from the statement of the expert himself) to the issue involved—and where the testimony of such expert is the sole basis for the com-

---

[4] We, of course, do not mean to imply that the expert should not read the record in advance.

mission's finding, we are firmly of the view that such expert should have an opportunity to review the additional evidence.

For the reasons herein set out, the judgment of the Circuit Court, affirming the commission, is reversed, and the cause is remanded to the Circuit Court with directions to reverse the commission's finding, and remand the cause to the commission for further proceedings in accordance with this opinion.